## ST. FRANCIS MILL COMPANY et al., Appellants, v. SUGG et al.

### In Banc, July 13, 1907.

1. **MOTION FOR NEW TRIAL: Dormant For Fifteen Years: Abandonment.** The *decision of this court in* St. Francis Mill Co. v. Sugg, 142 Mo. 364, holding that permitting a motion for new trial to lie dormant for fifteen years was not an abandonment of the motion, is questioned in this case; but that decision is the law in a subsequent appeal in the same case, and for that reason alone that *holding is recognized in the disposition* of the issues involved on this appeal.

2. **FRAUDULENT CONVEYANCES: Presumption of Payment: Lapse of Time.** There is no presumption, owing to great lapse of time, that judgments rendered in 1875, upon which unsuccessful executions were timely issued, were paid at the time this case, to have certain conveyances made by the judgment debtor to his brother set aside as being fraudulent as to his creditor, was tried in 1903, the suit having been instituted and first tried in 1880, and, a motion for new trial having been filed and allowed to lie dormant for fifteen years, the cause was, after two appeals on other points, tried again. When the case went back for a retrial after that motion had been sustained, it was to be tried on the condition of things as they existed at the institution of the suit in 1880. Besides, the evidence shows that the judgments were not paid.

3. **EVIDENCE: Lapse of Time.** There are cases in the proper disposition of which the *rules of evidence must be* relaxed. Owing to the great lapse of time from the institution of a suit to its final retrial twenty-three years afterwards, the principal participants being dead, and allowance being made for failing memory, the court, in determining whether certain conveyances grew *out of an attempt to defraud creditors,* will indulge its own experiences and draw all reasonable inferences from what evidence is before it.

4. **FRAUD: Characteristics.** Fraud is never proclaimed from the house top. It is fathered by a desire to do wrong, and has

St. Francis Mill Co. v. Sugg.

its birth in darkness. Often it is clothed with the adornments of honesty, beneath which, nevertheless, will be found unconscious blazings which mark the pathway the parties followed.

5. FRAUDULENT CONVEYANCE: Evidence. The evidence in this case is reviewed at length and the conclusion of fact reached therefrom is that the deceased grantor in deeds conveying twenty thousand acres of overflow land to his brother was at the time hopelessly insolvent and that his purpose in conveying the lands was to delay his creditors and stay off executions on judgments about to be rendered against him until he could pay them by forcing his creditors to take a part of them at exorbitant prices in settlement of their claims, and to hold the balance for himself, and that his brother, the grantee, shared in the purpose and intention of the conveyances, and that they were without consideration, and these being the facts the conclusion of law necessarily follows that they were fraudulent as to such creditors.

6. ———: Estoppel: Ultimate Justice. Nevertheless, there being evidence in the case that, after the judgment rendered in 1880 setting aside the deeds as fraudulent and after a motion for a new trial was filed, both sides agreed that the judgments might stand if two thousand acres embraced in the deeds were exempt from execution, and that some of those lands have been since sold, the deeds, on a retrial of the same cause in 1903, will not be set aside as to those lands.

Appeal from Jefferson Circuit Court. —*Hon. E. M. Dearing,* Judge.

REVERSED AED REMANDED (*with directions.*)

*W. M. Williams, M. L. Clardy, Jno. M. Wood, Jos. A. Wright, R. T. Railey, Wm. H. Clopton, C. P. Hawkins, Ely & Kelso* and *Walker & Cox* for appellants.

*Wilson Cramer* and *R. B. Oliver* for respondents.

GRAVES, J.—This is an action originally instituted in the circuit court of Dunklin county, April 2, 1875. It is a suit in equity in the nature of a creditor's bill to set aside for fraud a deed from Wm. S. Sugg to Wylie P. Sugg, of date May 24, 1871, but acknowledged on May 27, 1871, and therefore not delivered until said last-

named date. The name of the grantee in this deed appears in the record and briefs in different ways. In some places it is Willie P. Sugg, in others Wylie P. Sugg and further as W. P. Sugg. This is a mere matter of detail however. This deed covers something like twenty thousand acres of land in Dunklin county, formerly overflowed or swamp lands, the title to which was at one time in said county. The plaintiffs are and were judgment creditors of Wm. S. Sugg, lawyer, merchant and navigation contractor, as appears from the evidence, but not especially successful, along legitimate lines, in either avocation. The defendants are the heirs at law of Wylie P. Sugg, deceased. The case has a checkered career and some of the prior history, as traced from the record, will not be inapropos.

Wm. S. Sugg, then a merchant and lawyer in southeast Missouri, sometime prior to May 16, 1870, conceived the idea that he was engineer enough to make Varner river navigable from its head to its mouth and the St. Francis river from the mouth of Varner river to the southern line of Missouri. Accordingly, he entered into a contract to that effect with Dunklin county and for this feat of engineering was to receive from Dunklin county forty thousand acres of swamp land, to be. selected by said Sugg. June 22, 1870, he obtained patents to something less than one-half of the lands called for in this contract. The title thus conveyed he held until May 27, 1871, at which time he conveyed or attempted to convey the same to his brother, Wylie P. Sugg, for the expressed consideration of $1380, and the assumption and performance of the contract with Dunklin county as to these two rivers. This deed was acknowledged on May 27, 1871, and on May 29, the following Monday, the regular May term of the circuit court of Dunklin county was to and did begin. A number of the creditors, including several of the plaintiffs in this action, had previously instituted their suits in said

court to recover judgments against Wm. S. Sugg, merchant, for goods, sold, delivered and used, but not paid for, and these suits were about to culminate into judgments, and did, in due course of time and at said May term, result in judgments.  After unsuccessful executions, these judgment creditors, at the date aforesaid, instituted this suit. , On August 20, 1880, this suit finally reached a judgment in the circuit court of Dunklin county, the effect of which judgment is to find this deed in controversy fraudulent except as to two thousand acres of the land conveyed.  The defendants therein, the then heirs at law of Wylie P. Sugg, deceased, duly lodged their motion for new trial, which motion was permitted to lie dormant, until January, 1895, at which time a motion was filed in said circuit court for a *nunc pro tunc* entry showing the overruling of said motion for new trial, which motion for a *nunc pro tunc* entry was overruled by the trial court, and the judgment overruling the same was sustained by this court.  [St. Francis Mill Co: v. Sugg, 142 Mo. 358].  At the same term of said circuit court the trial court overruled the motion for a new trial in the language of the judge, "for the reason that the court deems the said motion to have been abandoned and to be not now pending in said cause."  This judgment was reversed by this court.  [142 Mo. 364.]  Following the ruling of this court, the trial court sustained the motion for new trial and the cause was opened up for a trial *de novo*. It might be well to remark here that the judge before whom the cause was tried had been succeeded by another.  This furnished the reason for the sustaining of the motion.  The cause was retried and at such trial all the issues were found for the plaintiffs, but the trial court after finding all the issues as to fraud in favor of the plaintiffs, dismissed plaintiffs' bill for the reason that the title to the land was yet in Dunklin county. Upon motion for new trial, the trial court set aside its

judgment dismissing plaintiffs' bill, and from this order the defendants appealed, but the action of the trial court was sustained by this court. [169 Mo. 130.] The cause was thus again left pending in Dunklin county for trial *de novo*. Defendants, evidently having in view the opinion of the trial judge upon the question of fraud, discovered prejudice in the mind of said judge, and made application for a change of venue, which application was sustained and the cause sent to the circuit court of Jefferson county, where it was tried again with the result that the deed from W. S. Sugg to Wylie P. Sugg was sustained and plaintiffs' bill dismissed, and judgment to this effect entered, as also judgment against plaintiffs for costs. From this judgment the plaintiffs duly perfected their appeal, and it is this record before us now for review. This is the court history of this case, save and except in going through our reports, we find that at an early day we were charged with the duty of investigating a side issue growing out of this case. [St. Francis Mill Co. v. Sugg, 83 Mo. 476.] This court had the cause and expressed opinion thereon as above indicated. This was at a time when the memory had not been dimmed by time, and the facts then and there involved will not be amiss here. From our opinion in 83 Mo. 476, it appears that the plaintiffs under the decree of 1880 had an execution for costs issued. This execution was levied upon the two thousand acres of land which was given to defendants by this decree of 1880. Defendants filed motion to quash the execution, assigning among other things, that the costs for which said execution was issued had been fully paid. There was a trial upon this motion before Hon. R. P. Owen, the same judge who had shortly prior thereto entered the original decree of 1880. This motion to quash was sustained by Judge Owen and his judgment thereon affirmed by this court. [83 Mo. 476.] With this we have the complete court history of the case entitled,

The St. Francis Mill Co. v. Sugg, except the chapter which we now proceed to write.

We question the views of this court as expressed in 142 Mo. 364. We are of opinion that the trial court was right in holding that there had been an abandonment of the old motion for new trial and for that reason there was no motion really pending, and that this court was in error in reversing that judgment. However, we did reverse it, and that opinion is the law of this case; the parties have acted upon it, and for that reason alone we shall recognize it in the disposition of the present issues. If it were an original proposition in another case, we would not feel bound by the views expressed in 142 Mo. 364.

To our mind, notwithstanding the voluminous record and great number of briefs in the case, the issues are few and simple. They are (1), Was this deed made by W. S. Sugg with the intent to hinder, delay or defraud his creditors? (2), Did Wylie P. Sugg know of and participate in said fraudulent intent? And (3), If the deed is found to be fraudulent are there any equities to be invoked in favor of the defendants as to all or any portion of the lands covered by said deed? In our judgment, answers to these questions solve the problems of this case. We will discuss the evidence in the course of the opinion.

I.

One contention made by the defendants is that these judgments of the plaintiffs are presumed to be paid owing to the lapse of time. These judgments constitute the foundation of the present action. They were such at its institution in 1875 and continue as such throughout. When this court reopened this case for trial, *de novo*, by our judgment in St. Francis Mill Co. v. Sugg, 142 Mo. 364, the case went back for this retrial on the condition of things as they existed at the institution of

this suit. The case was opened up for new trial by the judgment of this court, the propriety of which we question, as hereinabove indicated. At any rate, it would be inequitable and unjust to require a trial upon a state of facts other and different from those existing at the institution of the suit, especially when such new state of facts was not brought about by plaintiffs. The evidence abundantly shows the conditions then, and that there had been no change therein since the institution of the suit, save and except the division between some of the claimants of about six hundred dollars arising from the sale of these lands, the two thousand acres being excluded, as lands of the W. S. Sugg estate, under order of the court having probate jurisdiction. This was a mere pittance and only paid pro rata to a part of the judgment creditors. The effect of our judgment directing that the motion for new trial be sustained, was to simply leave the case where it was prior to the judgment and decree of 1880. There is where it should stand, and under such circumstances, we hardly think that either limitations or presumption of payment have any place in this case, in so far as these judgments are concerned. [St. Francis Mill Co. v. Sugg, 169 Mo. 136.] This contention is ruled against the defendants, and we shall undertake to consider the case upon its merits, along the lines hereinabove indicated.

## II.

1. Owing to the great lapse of time from the institution of this suit to its final retrial the evidence is not as satisfactory as it might have been at an earlier day. For that reason we will indulge our experiences and draw any and all reasonable inferences from what we have. We fully realize what was said by the learned jurist writing the opinion in the case of Richards v. Elwell, 12 Wright (Pa.) l. c. 367: "There is a time when the rules of evidence must be relaxed. We cannot sum-

mon witnesses from the grave, rake memory from its ashes, or give freshness and vigour to the dull and torpid brain." Nothing is more applicable to this case. The basis of the action is fraud. The principal actors are long since dead, and were, at each and all of the divers trials. Many others, whose testimony might have enlightened the court, are and were likewise gone. The remaining ones are not altogether clear in their recollections. But fraud usually leaves earmarks by which it can be traced. We do not agree with the learned trial judge in his conclusion that this deed was not fraudulently executed by W. S. Sugg, and that W. P. Sugg had no knowledge of, or participated in such fraud. Fraud is never proclaimed from the house tops, nor are fraudulent intentions reduced to writing and given to the public press. Fraudulent intents and fraudulent acts have their birth and origin in darkness, and are fathered by a desire to wrong. Ofttimes the parties attempt to dress them with the adornments of honesty, but beneath it all will be found unconscious blazings which will mark the real pathway followed by the parties. And X-Rays are not always required to follow the unconsciously blazed pathway. As said by SHERWOOD, J., in Massey v. Young, 73 Mo. l. c. 273-4:

"Fraud is rarely ever susceptible of positive proof, for the obvious reason that it does not cry aloud in the streets, nor proclaim its iniquitous purposes from the house tops. Its vermiculations are chiefly traceable by 'covered tracks and studious concealments.' [Cooley on Torts, 475; Hopkins to use v. Sievert, 58 Mo. 201; Burgert v. Borchert, 59 Mo. 80.] And though fraud is not to be presumed, yet it is as legitimate to infer its existence from surrounding circumstances pointing unmistakably to a wrongful purpose, as it is to thus infer under similar circumstances the commission of a crime; and this is done daily. Anything, therefore, which satisfies the mind and conscience of the existence of fraud

is sufficient. [Cooley on Torts, 476, and cases cited.]"

Let us take the evidence in the case at bar. In the fall of 1870, W. S. Sugg was in the mercantile business. Accounts and claims were being sent by creditors to attorneys and their collection being pressed. The contract with the county had been made and something less than twenty thousand acres of land had been patented to Sugg, but this was not money. Overflow lands were not then valuable, but in the mind of Sugg, no doubt, they were to become valuable. Subsequent history has demonstrated that his ideas were not ill-founded. We find him asking his creditors, through their attorneys, not to press him, because suits would ruin his credit as a merchant. We find him agreeing to confess judgment later, if the claims were not satisfied. The May term, 1871, of the circuit court was approaching. Many impatient creditors, tired of promises and delays, had brought suit. Nothing had been done toward satisfying creditors. That he was unable to meet his demands in the ordinary course of business, stands out in bold relief in this record. Shortly before, in his business, in closing up the co-partnership, he had taken over assets, some of questionable value, to the extent of a little over nine thousand dollars and assumed liabilities of the firm of something like six thousand and five hundred dollars, as detailed by one of his co-partners. This did not include individual and personal liabilities. After his death, which occurred two or three years later, judgments and claims aggregating ten thousand dollars appeared. All of which evidently existed at the date of this deed. In this situation, he goes across the Mississippi river a short distance to his brother's, at Dyersburg, Tennessee, who was likewise in the mercantile business, and who likewise had evidently been recently harassed by his creditors, although his co-partnership was a going concern. If his creditors were not pushing him at the time, they were shortly after-

ward. What occurred between these two brothers we can only reach by inference. Had each been alive and well at the trial the probabilities are that we would still have the privilege of reaching the real transaction by inference. Parties do not usually enter into a scheme to hinder, delay or defraud creditors, and later when called into court to explain their transaction, openly admit the facts. Such has not been the experience of either the bench or bar. So that, after all, in these cases we are forced to take the facts and circumstances as they appear, and from them undertake to draw rational and reasonable inferences and conclusions. When we have done that we have met the full measure in cases involving the question of fraud.

That W. S. Sugg was insolvent, in the ordinary undestanding of such term, at the time this deed was made, there seems to be but little question. The judgment of Judge Owen, in 1880, voices this view; the later judgment of Judge Fort is along the same line; and further the findings of Judge Dearing from which this appeal is taken, are not opposed to this view. Upon this proposition, the record evidence of judgments and futile executions, and other evidence in the record is too conclusive to require further discussion of the point. The only serious contention of the defendants is that patents were issued to the remaining twenty thousand acres of land under the contract, and that after the deed to W. P. Sugg, there was still this property in the hands of W. S. Sugg, and therefore he was not insolvent. In our judgment the great weight of the testimony refutes the contention of defendants in this regard. An attempt was made to inventory these lands, the second twenty thousand acres, as a part of the W. S. Sugg estate. The county court, then having probate jurisdiction, refused to allow such an inventory. In one capacity, they dealt with public lands, in the other they dealt with estates. Evidently the court while act-

ing upon the probate side of its jurisdiction was not
willing to blind itself to the knowledge it possessed by
reason of its familiarity of its record on the other side
of its jurisdiction. It did not so blind itself and as a
result it would not permit the second twenty thousand
acres of land to be invoiced as a part of the W. S. Sugg
estate. One Brewer was register of Dunklin county,
when the first lands were patented to Sugg in 1870. He
had in his possession a book now called "Patent Rec-
ord No. 2" and in this book is found the lands first se-
lected by Sugg, and patented to him in 1870. In April,
1872, the court house of the county and practically all
public records were destroyed by fire. This book seems
to have survived. Judge Brewer accounts for its survi-
val by the fact that it was at his house at the time of the
fire. That he kept it sometime after he had any use for
it, and that he finally turned it over. It seems that even
after the law creating the office of register had been
repealed, one B. T. Walker was acting as register of
the county. The office was abolished in 1869. This
party was the former partner of W. S. Sugg in the
mercantile business, his brother-in-law and later his
administrator. He has given two depositions in the
case, one in 1878, which shows fraud conclusively,
and later, another in which by adroit answers, for one
in his then apparent condition, he seeks to parry the
force and effect of the first deposition. From this book,
"Patent Land Record No. 2," there appear certificates
of purchase, authorizing patents, for this last twenty
thousand acres of land, signed by "B. T. Walker, Regis-
ter." Just how these entries could have been made
in the book by Walker, when Brewer had the book, does
not satisfactorily appear. These certificates are of date
May 15, 1871, at a time when this book was presumably
in the possession of Judge Brewer. On these certifi-
cates of Walker, as register, Walker, as administrator,
sought to have these lands inventoried as assets of the

Sugg estate. It is claimed that patents were in fact issued, and by Walker it is shown that they were in the court house for record and probably recorded when the building burned. A thorough reading of the record does not satisfy us that any such patents were issued. Walker said nothing about them in his deposition of 1878, but is the chief witness now. But on the contrary, we think the weight of the evidence shows otherwise. One of the judges of the county court at that time was yet living and he says patents were not issued, and much other testimony has a similar tendency. Subsequent actions show that there was no substantial claim to patents to the last twenty thousand acres. Officers charged with the collection of executions could not find them; attorneys diligently pushing claims did not find them; heirs of W. S. Sugg did not and have not found them, so far as the record shows, and Walker, former partner, brother-in-law, register and later administrator, has not brought them into the estate. These facts speak louder than a little public rumor, doubtless created by Walker, administrator, when he thought there was a chance to get this additional slice of the county for the estate of W. S. Sugg, and could use Walker, register, as a witness for that purpose. But enough upon this question. To our mind, the whole contract with the county is a huge joke, and was discovered and fully realized, after the county had parted with the title to the first lands, but before the court did part with the title to the other lands, and for that reason they did not part with title to the last twenty thousand acres. No doubt, W. S. Sugg could get certificates from Walker, register, and perhaps did get such, and the county court in later years, finding some innocent purchasers of these certificates, parties who had expended money on the lands in the way of improvements, may have recognized them and issued patents to such parties. These patents, so issued, appear as

original patents, and not as patents issued in lieu of lost or destroyed patents, thus negativing the idea that previous patents had been issued. One of them, the one to Thornton A. Slicer, recites that he, Slicer, had paid the money. It may be that as to Slicer, no improvements had been made. We all know how such things might happen with a county court. We conclude that the evidence conclusively shows the insolvency of W. S. Sugg at the making of this deed. This, however, is but one step. Did he intend thereby to hinder, delay or defraud his creditors and did W. P. Sugg know of and participate in such intent? This is the question next presented. It requires no stretch of imagination to reach a conclusion as to the intent of W. S. Sugg. He goes to Tennessee, gets his brother and brings him to Missouri; and upon the Saturday before circuit court was to begin Monday, this deed was acknowledged. He knew that these judgments would be taken in a few days at most. No sane person would doubt for a moment his intent and purpose. Charity might induce one to say that it was merely to hinder and delay, with the ultimate purpose of paying when he could realize from his property, but this is as far as one could go under the undisputed facts in this record. This is far enough, although subsequent matters in the record would justify a judgment broader. Under the evidence we conclude that there was upon the part of W. S. Sugg the purpose and intent of hindering, delaying and defrauding his creditors, these plaintiffs.

2. Did W. P. Sugg know of and participate in the fraudulent intent of W. S. Sugg? This is the real question in the case. It is fair to presume that the two brothers knew and discussed the financial situation of W. S. Sugg. To say that W. S. Sugg had not disclosed this condition to W. P. Sugg would be to brand him as a villain of a grosser character than we are willing to

attribute to him.  There may be some brothers who
would do such a thing but they are the exception and
not the rule.  The natural course would have been for
W. S. Sugg to have told his brother the real situation
and this we think he did.  That W. S. Sugg was hope-
lessly in debt and being crowded by his creditors is
so apparent from the record that it is useless to dis-
cuss it, and he did not undertake to have his brother
assume any serious obligations by taking a deed under
such circumstances, at least without apprising him of
the facts.  That the brother knew the facts we think
apparent from his subsequent actions.  On May 5, 1873,
just before his death, W. S. Sugg executed a power of
attorney to B. T. Walker, authorizing him to sell all of
the real estate of which he was seized and possessed.
Referring to this, Walker in his first deposition says:

"Q.  State if Willie P. Sugg knew of this arrange-
ment and this power of attorney?  A.  I don't know
whether he knew of the power of attorney or not till
after William S. Sugg's death, then I told him.  I
know that he did convey back one section of the land
that had been sold.

"Q.  Why was this power of attorney given you?
State what Willie P. Sugg said to you when you told
him of your power of attorney?  A.  He told me he
had been corresponding with a view of settling their
claims with these same lands.  He said he could not
get any of the creditors to take the land at his price;
he said he wanted ten dollars per acre.

"Q.  State if you had any conversation with
William S. Sugg about this conveyance to Willie P.
Sugg, of these lands before it was executed?  A.  I
don't remember, I did have some conversation with
him, but don't know whether it was before or after.  I
think it was after.  He said he, W. S. Sugg, was not
broke and busted as a great many of his enemies

206 Sup—11

thought, but if his health permitted, and he could trade his lands, he could pay out and have enough left to be rich.

"Q. State what conversation, if any, you ever had with Willie P. Sugg about this conveyance of these lands? A. I had a good many conversations with him —I had the first conversation with him in the fall after W. S. Sugg's death. He, Willie Sugg, asked my opinion in regard to Sugg's estate, and to the titles to these lands in question. I told him the titles were shaky. He said if I could settle the matter satisfactory, he would be willing to give or place at my disposal several thousand acres of land. I told him I thought the creditors would try to break up his title to the lands. Then he made me this proposition I mentioned, that he would be willing to give six thousand acres of land to settle the matter. I told him, to my recollection, some of the judgments against W. S. Sugg were rendered before any conveyance was made to him.

"Q. What further conversation did you have with him? A. I had conversations with him repeatedly. He said he was willing to pay W. S. Sugg's debts on a fair basis. He told me repeatedly that he was willing to pay W. S. Sugg's debts with lands — these same lands."

It should be remembered here, that by the alleged contract W. P. Sugg was doing the work for which W. S. Sugg was to have received forty thousand acres of land, for just half of the land, and paying $1,380 for the privilege, and yet was willing to settle the debts of W. S. Sugg out of the twenty thousand acres to him granted by this alleged bona-fide deed.

As to whether the $1,380 mentioned in the deed was paid, the same witness says:

"Q. State if you know whether Willie P. Sugg paid William S. Sugg thirteen hundred dollars or any other sum for the conveyance of these lands? A. I

do not know of W. S. Sugg receiving any money for the conveyance.

"Q. If he had would you have been likely to have known it? A. I believe I would have been likely to have known it. I had his other affairs in hand and paid him over money from time to time. I never saw him with any thirteen hundred dollars of his, or any large sum of money about the time of the conveyance, and I was in the office with him, I kept his accounts and his safe.

"Q. What was William S. Sugg's condition, so far as money matters were concerned, after the execution of this conveyance? A. Generally he had no large sum of money."

And again speaking of using the lands conveyed to W. P. Sugg to pay the debts of W. S. Sugg, the witness says:

"Q. Did you ever hear any conversation between William S. Sugg and Willie P. Sugg about this conveyance of these lands? A. I remember once, while both W. S. and W. P. Sugg were living, a letter came from some men in Cincinnati addressed to W. S. Sugg, containing a proposition to buy some lands from him, W. P. Sugg. William and William P. were not immediately together at that time. Willie broke open the letter and read it; he said, 'All right;' he said a good deal about selling lands at that time; I don't remember exactly what he did say; the gist of his conversation, however, was that if those men were willing to pay so much per acre for the lands they — I believe he said, 'We will sell them to them.' William S. Sugg, in conversation with me, always spoke of these lands as his."

Geo. Crumb, an attorney for some of the creditors, says:

"Q. What conversations did you have with Wiley P. Sugg in relation to these claims? A. (No answer).

"Q. Go on and tell, please? A. I had been try-

ing to make some effort to collect the claim through Ben Walker, who was administrator of the estate of W. S. Sugg.

"Q. Well, what passed between you and Wiley P. in reference to this matter? A. He introduced me to Wiley P. Sugg, is my recollection.

"Q. Now go on, and tell what passed? A. Mr. Sugg talked but very little, but he said that if he was given time that those claims would all be paid, he was satisfied.

"Q. That is, Wiley P. told you that? A. Yes, sir. Every honest claim he intended should be paid that his brother had contracted in these matters.

"Q. Did he tell you how he expected to pay those claims? A. I can't say that he stated how it would be paid, but he went on to say that he expected to see them all paid, that he had transactions with his brother and that it was his intention to pay them all off, out of the proceeds of the land which he had obtained from his brother."

H. H. Redford, another attorney with claims, says, on the same subject:

"Q. State if you know Wiley P. Sugg? A. I knew him when I met him. I never had any dealings with Wiley P. Sugg of consequence; met him and had a little talk with him, but never had any acquaintance with him.

"Q. What was the occasion of your going to Wiley P. Sugg? A. I went to see Wiley P. Sugg, because I was assured that he would assist in the payment of the claims.

"Q. Who gave you that assurance? A. My recollection is that I received that assurance from Wm. S. Sugg and Benjamin Walker.

"Q. (Col. Clopton:) How long after that conversation with Wm. S. Sugg was it before you saw Wiley P. Sugg? A. Well, I don't know. My recollection

about that is that Wiley P. Sugg went with me — that William S. Sugg went with me to Wiley P. Sugg and we three talked the matter over.

"Q. Now please state to the court as fully as you can, Major, what was said by the two Suggs and what was said by you concerning the payment of the claims which you held against William S. Sugg?

"Q. Go on, and answer, please? A. I couldn't undertake to say that I could make anything like a succinct statement of what was said, but the object of my meeting, or going there, was to see if I could make an arrangement with him by which the claims could be paid and Wm. S. Sugg told me that his brother would assist him in making any arrangement which could be made by which the debts could be paid.

"Q. What did Wiley P. Sugg say, give the substance of his remarks if you can, Major? A. The only statement I can make with reference to that was that I understood from Wiley P. Sugg that the position he occupied toward his brother was he would assist him in paying off any debts that could be paid with land.

"Q. What lands were mentioned, please sir? A. Well, I don't know that any specific lands were mentioned, but it was understood between us at that time that it was the lands that had been conveyed by the county to Wm. S. Sugg, and part of which had subsequently been conveyed to Wiley P. Sugg.

"Q. Did you at any subsequent time meet Wiley P. Sugg with reference to receiving any part of those lands in satisfaction of your claims? A. I don't think I ever had any conversation with Wiley P. Sugg about making any specific arrangements except the fact that at the time he and I had a conversation first, he said if he could make sale of the lands and spoke to me about it and asked me if I would be instrumental or asked me to assist him in making sale of the lands and said if that

could be accomplished he was ready to pay the claims at any time, and I think at different times he and I talked about the prospect of getting money to pay these claims out of the lands.

"Q. Was anything said at any of these interviews about your clients taking lands in payment? A. Where the idea originated I don't know now that I can state, but it was understood between me and William S. Sugg before his death and Wiley P. Sugg, too, that if the claimants would be willing to take the lands they would convey the lands in payment, an amount sufficient to pay the debts at a fair price.

"Q. Do you remember what price was demanded for those lands? A. As to any specific lands I don't know that I could state, but there was a statement to the effect that if they would pay as much as ten dollars an acre for the good lands they would pay the debts in lands at that price, and the claimants I had anything to do with thought it an exorbitant price and wouldn't agree to pay it.

"Q. About how long after the conveyance of Wm. S. Sugg to Wiley P. Sugg of this land were these conversations held? A. To be anything like precise, I can't do that, but it was not a great while after the conveyance. It was only a few years, for I never knew Wiley P. Sugg but perhaps from a year to eighteen months—that is about the space of time I knew Wiley P. Sugg as a man to be here."

And the same witness further says:

"Q. And you think it was about six months before Wm. S. Sugg's death? A. That the interview between Wiley Sugg and Wm. Sugg and myself took place?

"Q. Yes, sir. A. I think it was; I say six months — it was several months before his death.

"Q. Did Wiley P. Sugg, Major, on that occasion refer to the lands he had acquired from his brother,

Wm. S. Sugg? A. He referred to them in this way. The conveyance that was made to him intended to assist him in making an arrangement to settle these debts.

"Q. How is that? A. No special agreement about it at all. He said that the arrangement that had been made by the transfer of the lands from William to him was to enable William to pay his debts.''

There are some other excerpts from testimony bearing upon this question, but these are sufficient. In our judgment this whole transaction was one gotten up between the two brothers to save this land from execution sales of the creditors and eventually force the creditors to take land at a then exorbitant price in settlement of their claims, i. e., ten dollars per acre. The remainder would then be saved to them. In other words, there was a distinct understanding between them to hinder and delay creditors, and to the extent of forcing them to take lands at an exorbitant price to defraud creditors. We are also impressed with the idea that W. P. Sugg was simply holding these lands for the ultimate use of himself and his brother W. S. Sugg. Under all the circumstances of this case, it is hardly reasonable that W. P. Sugg would be assuming the entire contract for just one-half of the agreed contract price, and pay $1,380 for the privilege. The amount $1,380 is significant. Why the odd eighty dollars in a big deal? W. S. Sugg was a lawyer and some lawyers imagine that odd dollars or cents give an honest coloring to a fraudulent transaction. The evidence tends to controvert the idea that $1,380 was actually paid. Certain it is that no part of it went to pay the debts of W. S. Sugg. By one witness it is shown that W. S. Sugg said that he was going to work upon the rivers until such time as he got patents to the land and then he would throw it up as he had a bad contract. This, it is true, was bar room talk, but the conduct of the parties afterward indicates that such might have been the pur-

pose.  The evidence is overwhelming that W. P. Sugg, whilst ostensibly working for several years, did but little work, and intended to do but little.  The boat he purchased for the work cost him $55, and was something like ten by fourteen feet in dimensions, drawing one and one-half feet of water.  He cleared out some smart weeds, cut out a few logs and brush, and according to some evidence, notched a few trees, in order that his own narrow boat might pass through.  He couldn't have spent much money in the work, according to all the testimony.  To our minds his evident purpose was to assist his brother in holding the lands already patented, so that the creditors would not get them, and perhaps at the same time, through a friendly court, get patents to the other lands, and then, after the clouds had passed, there would be a division of the spoils.  The volume of evidence is great and much of it irrelevant and immaterial, but when boiled down, to our mind no other conclusion can be reasonably reached than that this deed was the outgrowth of an agreement between these two brothers to place this property beyond the reach of creditors at that time.

We therefore hold such deed to be fraudulent and void as to these plaintiffs, the creditors of W. S. Sugg. The case is one not so much of law as it is one of fact. When the facts are settled, the law is undisputed and of easy application.  We have thus far tried to consider the case as if it were being tried in 1880, when the original judgment was rendered.  In other words, upon the facts and conditions existing as of the date the petition was filed.  Subsequent matters we take next.

### III.

The decree of 1880 does not impress us as it seems to have impressed the able and distinguished counsel for the defendants.  W. P. Sugg died after the institution of the suit and after answer was filed.  Hacher & Davis, shown to be reputable attorneys, filed his answer.

Mr. Hacher, it seems, served for awhile in Congress. Mr. Davis was appointed guardian *ad litem* of the heirs of W. P. Sugg, minors at the time, since reaching their majority, and having in this record their own answer. Mr. Davis filed the usual answer for a guardian *ad litem*. Motion was made to quash the deposition of B. T. Walker taken in 1878. This motion was sustained one day by the court, and the next day by agreement the order sustaining the motion was set aside. Upon this act is predicated the alleged fraud in the decree of 1880. Walker had signed this deposition, although there may have been irregularity in the taking thereof. He was the brother-in-law of W. S. Sugg and the administrator of his estate. Mr. Davis could have reasonably and honestly concluded that the deposition as given was as favorable as he could expect, even upon a retaking of the same. This is perhaps what he did conclude. He was, to say the least, an appointee of the court, and the court was in the county where all the facts were known. No court would permit a grevious wrong to be perpetrated upon minors, and we are not of opinion that Judge Owen sat by and permitted such. The representative of the W. P. Sugg estate in Tennessee was unable to reach the trial and trial was had with the result indicated in what we have heretofore said of this decree of 1880. Counsel claim that it was a compromise decree, and such it may have been, but the time of the compromise does not strike us as it does counsel. They contend that there was no trial in fact but that the decree was agreed upon before hand. To our mind there are two things which conclusively refute this contention. First, if there was an agreed decree to be entered, there was no reason for reinstating the deposition of Walker. Second, the motion for new trial filed at the time, shows that evidence was heard, as does also the judgment. To our mind, the matter occurred thus: Counsel for the defendants concluded that they had

nothing to gain by the retaking of Walker's deposition; the trial was had and the court indicated a judgment for plaintiffs; thereupon this motion for new trial was filed, no doubt accompanied with threats of an appeal. Then it was, in our judgment, that the agreement between counsel to exempt the two thousand acres occurred, and then came the decree which was written up and entered. This will account for the fact that the motion was permitted to lie dormant so long. If there was an agreed decree prior to this motion, no motion would have been filed. Had Mr. Davis agreed that plaintiffs might even make formal proof and take their decree, provided they would exempt two thousand acres, there would have been no motion for new trial. We feel satisfied that the agreement was reached after the motion was filed and the announced judgment of Judge Owen was modified into the decree as entered. This was evidently the understanding the clerk had when, in making up the docket for the next term, he marked this case as it appeared upon the May docket as "Off." [See 142 Mo. 358.] So the letter of Mr. Davis to his clients notifying them of the result, would indicate as much. We believe this matter was in good faith and that the guardian *ad litem*, so far as indicated in the record, should not be charged with fraud.

We have gone through this matter for a purpose, other than that of exonerating Mr. Davis. He is long since dead and what we may say can neither add to nor take from whatever reputation he left with his people. These plaintiffs were there at that time, of full age and represented by counsel. They permitted the decree to be thus entered. By their agreement, it was thus entered. Under the record in this case, the heirs of W. P. Sugg have sold at least seven hundred acres of this exempted land. Other portions may have been sold and passed into the hands of innocent persons upon the faith of this decree, entered by the consent and

agreement of these plaintiffs. If the defendants have sold this two thousand acres, they are estopped, and by the actions of the plaintiffs, in agreeing to this decree, they should not be permitted to reap the benefits, especially as against innocent purchasers, if such there be, and seven hundred acres at least have been sold. To give plaintiffs this two thousand acres would be inequitable. To disturb these titles at this date would work a hardship. The other titles under this same decree of 1880 have passed as if no deed had been made. For the reasons heretofore given this case should be and is reversed, but it being one in equity we will direct a judgment in conformity with our views of the equities of the case, and one which will in no wise disturb the titles. We have the whole case before us, and in our judgment equity and justice will be reached by directing a decree in conformity with the decree of 1880.

The judgment of the trial court is therefore reversed, and the cause remanded with directions that judgment be entered for plaintiffs, setting aside the deed from W. S. Sugg to W. P. Sugg, except as to the following lands, therein described, to-wit:

"All of section 30, east half of section 28, all of township 14, southeast quarter of section 24, all in township 17 north, in range 8 east, and lots 1, 2, and 3, in section 15, and lots 1, 2, 3, 4, 6, 7 and 8, in section 28, all in township 17 north, range 7 east."

As to such lands said deed to be valid and binding, and that plaintiffs have judgment for costs in this court, as well as in the circuit court.

All concur, except *Fox, J.,* who dissents, and *Burgess, J.,* who was not present at the argument and does not sit.