Hobart T. ALLISON, Appellant,

v.

A. W. MILDRED, Vincil Mildred, and Mildred E. Mildred, and Mutual Benefit Life Insurance Company, a Corporation, Respondents.

No. 45605.

Supreme Court of Missouri, Division No. 2.

Nov. 12, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 9, 1957.

W. W. Van Matre, Jr., J. W. Buffington, Mexico, for appellant.

Fry, Edwards & Wright, Jackson A. Wright, Mexico, for respondents Vincil Mildred and others.

Don C. Carter, Sturgeon, for respondent A. W. Mildred.

BOHLING, Commissioner.

This is a suit by Hobart T. Allison, a judgment creditor, against A. W. (also known as Willard) Mildred, the debtor and grantor, and Vincil Mildred and Mildred E. Mildred, husband and wife, the grantees, and Mutual Benefit Life Insurance Company, a corporation to set aside two deeds, one conveying a 200-acre tract (sometimes herein referred to as the farm), and the other conveying a 60-acre tract in Audrain County, Missouri, on the ground said deeds were made to hinder, delay and defraud said creditor and were the result of a conspiracy between said grantor and grantees. § 428.020. (Statutory references are to RSMo 1949 and V.A.M.S.) The answers, so far as material, were denials. Defendant Mutual Benefit Life Insurance Company holds a deed of trust against the 200 acres to secure an original indebtedness of $4,000. Plaintiff stated to the court he was presenting no issue respecting the validity of said deed of trust; and, unless otherwise indicated, the word defendants herein refers to the individual defendants, each of whom testified on their behalf at the trial. The chancellor found the facts in favor of all defendants, and the decree was in accord therewith. The main controversy is over the 200 acres.

A. W. and Vincil Mildred are brothers. They purchased the 200 acres for $3,200, and gave a deed of trust, dated November 10, 1939, thereon to secure $2,300 of the purchase price. For two years prior to 1945 the brothers rented or leased the 200 acres, and A. W., although he was not sure, testified he worked at the A. P. Green Firebrick Company's storeroom, and in the Fall of 1944 for the Sinclair Oil Company in Mexico. Vincil has worked for the Green Company since 1933, and as a supervisor since 1936. In 1939 he purchased 40 acres east of Mexico, Missouri. He married defendant Mildred E. Mildred in August, 1942. They lived on the 40 acres.

By a warranty deed, recorded March 18, 1944, Vincil and his wife conveyed his one-half interest in the 200 acres to A. W. for a consideration of $3,000. A deed of trust against the 200 acres was recorded March 18, 1944, securing A. W.'s $3,000, 6%, note payable to the Mexico Savings Bank. This note shows two credits of $90 interest each on "9–18–44" and "3–18–45." We understand the $2,300 indebtedness against the 200 acres was discharged. A. W. testified he paid Vincil all but $500 of the purchase price at that time but did not remember whether he gave a note for the $500. Vincil testified he received $1,150 from A. W. and a note for $500; and on

cross-examination also stated: "I don't know as I ever saw the note. I don't know whether I even got it or not."

On May 18, 1944, defendant A. W. Mildred was served with summons in a suit by plaintiff to recover $10,000 damages, which suit resulted in a judgment against defendant of $5,000 actual and $5,000 punitive damages on March 28, 1950, for criminal conversation with plaintiff's wife. This judgment, upon appeal, was affirmed. Allison v. Mildred, Mo., 245 S.W.2d 86. Execution was issued and returned nulla bona November 3, 1952. Said judgment is unpaid.

Vincil and his wife read an article in the Mexico paper of May 20, 1944, of plaintiff's suit against A. W. for $10,000 damages. She stated she never discussed the suit with her husband or with A. W. In a deposition offered by plaintiff as an admission against interest Vincil stated he saw A. W. about once or twice a month and that "naturally" they discussed the suit. On direct examination at the trial he stated: "I don't remember ever having any conversation with him about it, no." On cross-examination he stated he did not remember that far back, but that he gave the testimony appearing in the deposition. A. W. testified he and his brother might have said something about plaintiff's suit for damages, but he did not remember what was said.

On May 24, 1944, six days after service of the aforesaid summons, A. W. deeded the 200 acres to "S & N Trading Company, a corporation," (hereinafter for convenience referred to as S & N), the grantee assuming and agreeing to pay the $3,000 deed of trust. This deed was recorded May 24, 1944. R. G. Stewart, who was dead at the time of trial, and Forest T. Noel represented S & N.

A. W. testified: He sold to get money to fight plaintiff's suit and to pay some bills. He cashed S & N's $3,000 check at the Mexico Savings Bank, where he banked. He paid all bills, except the $500 he owed Vincil. He did not remember whether he paid all his bills. He thought he got a little "over $2,000 cash." The bank "held out" $500 or $600. He had about $2,300 after paying the bank, and he placed approximately $2,300 in a lock box at the bank, because he didn't want some one who was suing him "messing with it."

A. W. testified the 200 acres was the only property he owned when he sold to S & N. He was not living on the land and he had no livestock.

Four weeks later, to wit, June 21, 1944, A. W. contracted with S & N to repurchase the farm. This contract, after naming the parties, recited that S & N "has this day sold to" A. W. the farm, describing it, "for the sum of" $6,750 "to be paid in the following manner:" $1,250 "cash, the receipt is hereby acknowledged, and the balance of" $5,500 "with interest at" 6% "from May 24, 1944, to be paid December 20, 1944." A. W. "agrees to pay all taxes and insurance." This was followed by the signatures of the parties.

A. W. testified he repurchased for $750 more than he sold because he thought the land was worth the money, and that he secured the $1,250 from his lock box.

A. W. testified that he sought a loan on the 200 acres for the purpose of paying the $5,500; that lending agencies looked at the land, appraised it, and his application was meeting with approval until they asked him some questions. Unable to secure the loan, he paid nothing further on the contract. His cash payment of $1,250 was never returned to him.

S & N, by Forest T. Noel, President, executed a deed (dated December 15, 1944, acknowledged December 21, 1944, and recorded March 12, 1945) conveying the 200 acres to A. W.

Vincil stated his wife wanted to move to town. On June 3, 1944, they borrowed $1,500 on his 40 acres and made a $1,500 down payment on a home in Mexico. This left them owing $3,500, which was

secured by a deed of trust on the town residence. Soon thereafter John Plybon contracted to buy the 40 acres and livestock thereon for $3,200 or $3,250, paying Vincil $300 or $400 earnest money. Vincil and his wife moved to their new home in September, 1944. On January 8, 1945, Plybon concluded his purchase, and Vincil deposited $2,872.50 to his credit in the Mexico Savings Bank, paid the $1,500 against the 40 acres, and on January 19, 1945, put $1,200 in his lock box at the bank, he stated, so he would not check it out but hold it for the purchase of a farm.

Vincil testified he sold his one-half interest in the 200 acres in March, 1944, because he was making a profit, and, having married, wanted to get away from the partnership and buy a larger farm of his own, as was his plan when he sold his 40 acres a few months later. His son was then one year old and he thought he could give him "a little better chance" if he had a farm. When he learned the 200 acres was for sale, he purchased it because he thought it worth the money, "a better buy than anything I could find," had been his father's home place, and he more or less always wanted it.

Mrs. Vincil Mildred testified that her husband did the talking and negotiating for the 200 acres.

A. W. knew Vincil was looking for a farm, but he made no effort to sell his 200 acres to Vincil, stating he supposed Vincil did not want it. Vincil, more or less always wanting the 200 acres, did not talk to A. W. about buying because he assumed A. W. "wasn't wanting to sell." He learned about the first of 1945 from Stewart or Noel that he might buy the 200 acres. At that time he probably knew A. W. had sold to S & N. He started negotiating for it after Plybon paid him. Vincil knew A. W. had contracted to repurchase the 200 acres from S & N, had been unable to complete this purchase, and A. W. told him he was losing $1,250 about the time Vincil agreed to purchase from S & N. Vincil testified although he knew A. W. claimed he, A. W., was going to lose $1,250 when he, Vincil, agreed to buy from S & N, he didn't go into it with A. W. because "I wasn't too interested about it"; "that was his problem—it wasn't mine." A. W. testified Vincil told him he had purchased the 200 acres about a month or two before Vincil settled for it.

Vincil's purchase of the 200 acres was consummated when a general warranty deed (subject to A. W.'s $3,000 deed of trust which the grantee assumed and agreed to pay) from S & N to "A. W. Mildred, single and unmarried" (dated December 15, 1944, acknowledged December 21, 1944, as hereinbefore mentioned), and a like general warranty deed from "A. W. Mildred, single and unmarried," to "Vincil Mildred and Mildred E. Mildred, husband and wife" (dated and acknowledged March 12, 1945) were filed for record at 11:20 and 11:25 a. m., respectively, on March 12, 1945. This transaction was closed at the Mexico Savings Bank, R. G. Stewart, Vincil and his wife, and A. W. being present. Vincil testified he there first learned that S & N had deeded the 200 acres to A. W. A. W. testified that Stewart called him to the bank; that he then first learned of the deed from S & N to him, which was never delivered to him, and he signed the deed to Vincil and wife at Stewart's request. A. W. also testified he knew about the deed from S & N to him a day or two before. A. W. received nothing for his deed to Vincil and wife. Vincil stated that he asked that morning why S & N had deeded to A. W., and that he made the final buy from R. G. Stewart of S & N.

The deeds of May 24, 1944, and of December 15, 1944 recite a consideration of: "One dollar and other valuable consideration"; and the deed of March 12, 1945, recites a consideration of: "One dollar and other considerations."

Vincil testified he paid a total of $5,760 for the land. The evidence shows he paid

the balance due under the purchase contract of A. W. with S & N for the 200 acres ($6,750 minus A. W.'s $1,250 down payment plus interest on $5,500 from May 24, 1944). He identified a duplicate deposit slip of March 12, 1945, to his credit in the Mexico Savings Bank for $2,767.71, made up of three items, explained by him as follows: $567.71 derived from War Bonds cashed that day. $1,200, being a redeposit of the money he had placed in his lock box. $1,000, representing A. W.'s payment of the $500 A. W. owed on his purchase of Vincil's one-half interest, and $500 Vincil borrowed from A. W. on March 12, 1945. An undated assignment of A. W.'s repurchase contract is endorsed thereon, executed by Forest T. Noel, president of S & N, to Estelle W. Stewart, the wife of R. G. Stewart of S & N. Vincil issued his check, dated "3–12–1945," payable to Estelle Stewart for $2,620, and handed it to Mr. Stewart.

Vincil and his wife borrowed $4,000, payable $50 semi-annually, on the 200 acres from defendant Mutual Benefit Life Insurance Company. This deed of trust was dated May 8, 1945, and recorded May 12, 1945. He used this $4,000 to pay off A. W.'s $3,000 loan, paying the Mexico Savings Bank $3,028, to repay A. W. the $500 he had borrowed, and to pay A. W. $135, which he testified was for three sows. Cancelled checks covering these payments were offered in evidence.

Vincil has continued to live in town and work for the Green Company. He testified he had some stock on the 200 acres after he purchased, could not care for it himself, and got A. W. to help him on the farm. A. W. and his mother moved onto the farm in the Spring of 1945 and lived there several months. A. W. married in 1945 and moved to Fulton, where he lived for a couple of years. While living in Fulton he would go by the farm once a day and look after the few head of stock on the place. A. W., whose testimony is confusing, testified at the trial that he moved back to the farm in 1948. He also testified he moved from the farm to Fulton in the Fall of 1945, living there a couple of years in 1946 and 1947 before moving back. Jesse M. Hays and Calvin Poff, disinterested witnesses testifying for plaintiff, established that A. W. lived at the farm from the Spring until after harvest time in 1945; that Calvin Poff next lived on the farm until October, 1946, and, after he left, A. W. moved back to the farm and has lived there ever since.

We state at this point that our view of the evidence does not sustain the findings of the chancellor "that A. W. was on the farm for only a month or so in 1945 and left it for a couple or three years, returning in 1948."

Vincil testified he told A. W. he would pay him what he could for what A. W. did until he got so he could pay A. W. full time, and that the land was farmed on a small scale for three or four years as he lacked funds for livestock and equipment. Neither Vincil nor A. W. could estimate what Vincil paid A. W. the first few years for work on the farm. Vincil thought he had no checks covering such payments. A. W. received a furnished house, meat, heat and other small items. Vincil stated he started paying A. W. $50 a month, cash or check, after he purchased a tractor in 1948 and commenced cultivating the land. There were no set times for making the $50 payments, Vincil paying if he had the money whenever A. W. said he needed it, and two or three months might elapse between payments. The record discloses no other cash income to A. W. and no records, such as cancelled checks, substantiating the $50 payments were offered in evidence.

Walter F. Bradley, a disinterested witness for plaintiff, who lived on an adjoining farm 5 or 6 months in 1946, testified about 35 cattle and 65 hogs were on the 200 acres; that A. W. passed by every morning and sometimes stopped and talked; that he asked A. W. if he was taking care of the stock for somebody and A. W. answered: "No, that he owned that farm and the stock." A. W. denied making the state-

ment to Bradley, stating "I don't know him"; and, on cross-examination, that he had seen Bradley in the neighborhood but "I never had a conversation with Mr. Bradley or nobody else about owning any farm."

Defendants' evidence was that Vincil is at the farm one or more times a week, discusses its operation, and gives A. W. instructions. A. W. attends to most of the purchasing and selling of the livestock and crops. Vincil handles the finances, receives the income and pays all expenses. A. W. was authorized to sign Vincil's name to checks for things needed at the farm but was not authorized to sign checks for his own pay.

Some additional evidence is mentioned hereinafter.

■ Section 428.020 provides: "Every conveyance * * * of any estate or interest in lands * * * made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands * * * shall be from henceforth deemed and taken, as against said creditors * * * to be clearly and utterly void." Plaintiff was a creditor of A. W. under § 428.020. George v. Surkamp, 336 Mo. 1, 76 S.W.2d 368, 370 [1].

■ Fraudulent transfers of the nature here involved are easily executed and most frequently are difficult to prove. Experience discloses that such grantors and grantees do not openly admit the facts when called into court. The instant plaintiff was driven to the camp of his adversaries for a material portion of his proof. "III. While it is undoubtedly true as a general legal proposition that 'fraud is not to be presumed, but must be proved by the party alleging it,' yet it is equally true, that fraud is seldom capable of direct proof, but for the most part has to be established by a number and variety of circumstances, which, although apparently trivial and unimportant, when considered singly, afford, when combined together, the most irrefragable and convincing proof of a fraudulent de-

sign." Burgert v. Borchert, 59 Mo. 80, 83. St. Francis Mill Co. v. Sugg, 206 Mo. 148, 155, 104 S.W. 45, 47(2); Citizens' Bank of Hayti v. McElvain, 280 Mo. 505, 219 S.W. 75, 77; Matz v. Miami Club Restaurant, Mo.App., 108 S.W.2d 975, 979 [4].

Defendants, contending the preponderance of the evidence with respect to the 200 acres showed that the conveyances were not in fraud of the rights of creditors, stress cases pointing out that plaintiff had the burden of proof, and where the conveyance may as well be consistent with honesty and fair dealing as with a fraudulent purpose, it is referred to the better motive. Farmers & Merchants Bank of Festus v. Funk, 338 Mo. 508, 92 S.W.2d 587, 589 [1, 2]; Jones v. Nichols, 280 Mo. 653, 216 S.W. 962, 964 [1, 2]. They also cite Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297, 303; Farmers Bank of Higginsville v. Handly, 320 Mo. 754, 9 S.W.2d 880, 894; Hendrix v. Goldman, Mo., 92 S.W.2d 733, 735.

■■ Deference is given in a close case to the findings of a chancellor resting upon the credibility of witnesses giving conflicting testimony. Hendrix v. Goldman, supra; Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870, 876. Equity cases, however, are tried de novo upon appeal and the appellate court makes its own findings in instances where the weight of the evidence is against the decree of the trial court. Ver Standig v. St. Louis Union Tr. Co., 344 Mo. 880, 129 S.W.2d 905, 907 [1–3]; Scott v. Barton, 285 Mo. 427, 226 S.W. 958, 960 [5]; Whetsel v. Forgey, 323 Mo. 681, 20 S.W.2d 523, 526 [1, 2], 67 A.L.R. 476. All competent evidence and legitimate inferences of record, including evidence of record offered but excluded, are for consideration. Farmers & Merchants Bank of Festus v. Funk, supra, 92 S.W.2d 587, 592. The findings of a chancellor lose weight when material evidence is excluded or not given consideration. Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, 285 [8, 9], 4 A.L.R.2d 826. See Chambers v. Chambers, 227 Mo. 262, 287, 127 S.W. 86, 93.

We have said courts of equity apply a most rigid scrutiny to transactions between brothers when there is a charge of fraud. First Nat. Bank of Plattsburg v. Fry, 216 Mo. 24, 42, 115 S.W. 439, 445. Direct and positive knowledge of the debtor's fraudulent purpose by the grantee is not required. If the facts and circumstances brought to the attention of the grantee are such as to put an ordinarily prudent person on inquiry and reasonably lead to knowledge of the grantor's fraudulent purpose notice to and knowledge of such purpose on the part of the grantee may be inferred. National Bk. of Commerce v. Brunswick Tobacco Wks. Co., 155 Mo. 602, 609, 56 S.W. 283, 285; Rupe v. Alkire, 77 Mo. 641, 643(3); Roan v. Winn, 93 Mo. 503, 511, 4 S.W. 736, 738; State to Use of Erhardt v. Estel, 6 Mo.App. 6, 9. To be a grantee without notice, the grantee must be such at the time of the payment of the purchase money. Citizens Bank of Hayti, v. McElvain, 280 Mo. 505, 219 S.W. 75, 79. If the grantee have knowledge or be charged with notice of the debtor's purpose to hinder, delay or defraud his creditors, the transfer is none the less void no matter how valuable the consideration. McDonald v. Hoover, 142 Mo. 484, 494(II), 44 S.W. 334, 336(2); Aull v. Gaffin, 234 Mo. 171, 176, 136 S.W. 343 [7].

There are a number of indicia or badges of fraud and, although usually none by itself establishes fraud, a strong inference of fraud arises from a concurrence of several badges of fraud; such as: A conveyance in anticipation of suit; a conveyance to near relatives; inadequacy of consideration; unusual clauses in instruments or unusual methods of transacting business; transfer of all or nearly all of a debtor's property; insolvency; retention of possession by the debtor; the failure to produce available explanatory or rebutting evidence when the circumstances attending the transfer are suspicious. Matz v. Miami Club Restaurant, Mo.App., 108 S.W.2d 975, 979; Munford v. Sheldon, 320 Mo. 1077, 9 S.W.2d 907, 910 [5–11]; Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870, 877 [11]; Toomay v. Graham, Mo. App., 151 S.W.2d 119, 124 [2–4].

If, as the chancellor stated, A. W. was simply a straw man in the transaction for passing the title from S & N to Vincil, then the situation was one to arouse suspicion. Schaeffer v. Moore, Mo., 262 S.W.2d 854 [10]; Houtz v. Hellman, 228 Mo. 655, 669, 128 S.W. 1001, 1005.

Defendants' witnesses established that of the $3,000 A. W. received for the farm from S & N, A. W., after paying his bank $500 or $600, placed $2,300 in his lock box to keep plaintiff from "messing with it"; and, as this was all the property he had, $1,250 of said $2,300 was used, first, to make the downpayment to S & N on A. W.'s repurchase contract and later as a credit reducing the price of this farm for Vincil's purchase from S & N, with an additional $1,000 of said $2,300 to complete Vincil's purchase from S & N, $500 of which Vincil stated he borrowed and later repaid to A. W. A. W. produced no "bill" that he had paid, and, although pressed could not "remember" any bill so paid except the $500 or $600 paid to the bank. He hid the $2,300 in his lock box for the purpose of hindering, delaying or defrauding this plaintiff. We have no doubt of A. W.'s purpose. His acts speak louder than his words; and we are unable to agree with the chancellor's finding that A. W.'s sale to S & N was made (as first testified to by A. W.) because of need for money to pay bills and to defend plaintiff's damage suit; and that the only suspicious circumstance attached to the deed is its execution six days after summons was served upon A. W.

We are of the opinion A. W.'s sale of the 200 acres to S & N on May 24, 1944, six days after service of summons in plaintiff's suit for damages; A. W.'s contract four weeks later, June 21, 1944, to repurchase at an advance of $750 from S & N; S & N's deed to A. W. dated December 15, 1944, and acknowledged Decem-

ber 21, 1944, followed by A. W.'s deed to Vincil and wife on March 12, 1945, were unusual business transactions. This for several reasons, among which are: The written contract named $6,750 as the consideration but did not state the $3,000 mortgage against the land was to be deducted from said $6,750. It did not provide for the disposition of the $1,250 down payment in the event A. W. did not complete the transaction. The purchaser was obligated to pay 6% interest on the $5,500 balance from May 24, 1944, and all taxes and insurance while the ownership and usufruct was in the vendor. The contract implied a divestiture of title out of S & N if A. W. paid the $5,500 balance on December 20, 1944; but S & N executed its deed to A. W. on December 15, 1944, five days prior to the date of performance by A. W., and acknowledged said deed on December 21, 1944, one day after default in performance by A. W. While a certificate of acknowledgment constitutes prima facie evidence of the delivery of a deed (Barbee v. Farmers' Bank, 240 Mo. 297, 306, 144 S.W. 839, 841 [1]; Baker v. Baker, 363 Mo. 318, 251 S.W.2d 31, 37, 33 A.L.R.2d 1431), the instant grantee testified and all the testimony on the issue was that the deed was never delivered to the grantee (Harrison v. Edmonston, Mo., 248 S.W. 586, 588), and we are unable to agree with the chancellor's holding that the title had vested in A. W. and could not be divested by the destruction of the deed.

■ Plaintiff's witness Larkin C. Poff placed the value of this 200 acres at $12,000 and plaintiff placed it at $11,000 in 1945. The conveyances between Vincil and A. W. and A. W. and S & N were for $6,000, and A. W.'s repurchase from S & N was for $6,750, A. W. stating the 200 acres was worth it. A. W.'s efforts to secure a loan to pay the $5,500 balance under his repurchase contract were meeting with success until the loan agents asked him, defendants state, about lawsuits against him. Vincil secured a loan of $4,000 on the farm in May, 1945. He paid the differ-

ence between A. W.'s repurchase price of $6,750 and A. W.'s $1,250 down payment, plus 6% interest on $5,500 from May 24, 1944, for the 200 acres. Vincil knew prior to his payment of the purchase money that A. W. was losing this $1,250. He accepted A. W.'s deed, and received the benefit of A. W.'s $1,250 down payment, as well as the $1,000 A. W. let him have to complete the transaction. If we give consideration to the farm having a loan value up to $5,500 and the $12,000 valuation placed upon it by the disinterested witness Poff, Vincil purchased for an inadequate consideration. We think he knew this. The chancellor's findings make no mention of the value of the farm or the adequacy or inadequacy of the consideration. Munford v. Sheldon, 320 Mo. 1077, 9 S.W.2d 907, 910 [6, 11]; Friedel v. Bailey, 329 Mo. 22, 44 S.W.2d 9, 14 [9]; Matz v. Miami Club Restaurant, Mo.App., 108 S.W.2d 975, 979. If part of the consideration be fraudulent, the entire transaction is fraudulent. Munford v. Sheldon, supra; Toomay v. Graham, Mo.App., 151 S.W.2d 119, 124 [3].

The evidence showed these brothers were closely associated with each other. The 200 acres was a better buy than anything Vincil could find. He knew of plaintiff's suit for damages against A. W., that A. W. had not paid him the $500 he owed, and was losing $1,250 in the transaction, and the inference is that he knew A. W. had disposed of all his property and was insolvent. These and other badges of fraud of record were sufficient to put Vincil on inquiry; and we do not agree that A. W.'s interest in the transaction was only A. W.'s problem. Inquiry of A. W. should have disclosed the reason he was unable to secure the $5,500 loan, as well as other facts. Vincil did all the negotiating for the purchase and was his wife's agent.

While plaintiff had the burden of proof, the burden was on defendants in the circumstances of record to go forward with evidence to show that Vincil's purchase was in good faith, without notice of the

fraudulent purpose of A. W. George v. Surkamp, 336 Mo. 1, 76 S.W.2d 368, 374 [10]; First Nat. Bank of Monett v. Vogt, 344 Mo. 284, 126 S.W.2d 199, 201 [1]. There is evidence substantiating a valuable consideration passing from Vincil for the farm; but, as pointed out supra, a valuable consideration alone is not enough. Following Vincil's purchase in March, 1945, A. W. went into possession of the farm for several months; then, while living in Fulton, drove by to feed the stock, and returned to the farm sometime after Calvin Poff moved off in October, 1946, and has since been in possession and living at the farm. The testimony of A. W. and Vincil was that A. W. worked at the farm as an employee of Vincil, and Vincil paid A. W. by cash and by check. Neither, however, could estimate how much Vincil paid A. W. any of the first three years under Vincil's agreement to pay what he could for work performed by A. W. No check was offered in evidence substantiating any payment to A. W. as an employee of Vincil, including any $50 monthly payment beginning sometime in 1948 and continuing to the date of the trial in 1956. In Farmers & Merchants Bank of Festus v. Funk, 338 Mo. 508, 92 S.W.2d 587, 590, stressed by defendants, the tax receipts, notes, and checks involved were produced.

Forest T. Noel, President of S & N, executed the repurchase contract with A. W., the assignment of said contract to Estelle W. Stewart, and S & N's deed to A. W. Vincil's $2,620 check for the consideration was made payable to Mrs. Stewart and was handed to her husband. In view of the unusual business transactions passing the title from A. W. to S & N, from S & N to A. W., from A. W. to Vincil, and the unusual provisions connected with A. W.'s repurchase contract, provisions in as well as provisions omitted therefrom, we are unable to agree with the chancellor's finding that no unfavorable inference against defendants may arise from their failure to produce Noel as a witness. He was an active participant in this unusual transfer of real estate involving the defendants, involving perhaps a straw party or parties, was living at the time of trial, and was available to defendants to rebut the unfavorable inferences arising out of the transactions and from the evidence. Plaintiff was not a party to these transfers and they affected his rights as a creditor of A. W. Block v. Rackers, Mo., 256 S.W.2d 760, 764; Trzecki v. St. Louis Pub. Serv. Co., Mo., 258 S.W. 2d 676, 678; Irle v. Irle, Mo.App., 284 S.W.2d 44, 47; Baldwin v. Whitcomb, 71 Mo. 651, 658.

Additional factual situations are presented by plaintiff in support of the conclusion that Vincil was charged with notice if he did not have actual knowledge that the transfer of the 200 acres was to hinder, delay or defraud plaintiff. We deem it unnecessary to develop these.

█ Plaintiff's claim with respect to the 60 acres is without merit. Vincil and A. W. acquired the 60 acres by a deed recorded July 19, 1949. All the evidence is that the consideration was $800, which was paid by Vincil and A. W. gave Vincil his note for $400. A. W. did not pay the $400 note. By a quit-claim deed recorded August 31, 1951, A. W. and wife conveyed the 60 acres to Vincil and wife and A. W.'s $400 note was returned to him. There is no showing whatever that A. W.'s interest exceeded his purchase price indebtedness to Vincil; and in these circumstances A. W. had the right to thus discharge the debt. Kincaid v. Irvine, 140 Mo. 615, 623, 41 S.W. 963, 965; Farmers & Merchants Bank of Festus v. Funk, 338 Mo. 508, 92 S.W.2d 587, 591. We think the fact that A. W. held title to a one-half interest in the 60 acres between March 28, 1950, the date of plaintiff's $10,000 judgment, and August 31, 1951, the date of A. W.'s deed to Vincil and wife, does not overcome the badges of fraud with respect to the 200 acres. A. W. gave no appeal bond, but the issues involved in A. W.'s appeal of plaintiff's judgment were not finally adjudicated until January 14, 1952 (see 245

S.W.2d 86), and by that time A. W. had deeded to Vincil and wife.

The decree with respect to the 60 acres is affirmed; but with respect to the 200 acres the decree is reversed with directions to subject the transfer by "A. W. Mildred" to "Vincil Mildred and Mildred E. Mildred, husband and wife," here involved, to the rights of Hobart T. Allison, plaintiff, under § 428.020 as a creditor of defendant A. W. Mildred, said plaintiff conceding his rights under § 428.020 to be subject to the rights, title and interest of defendant Mutual Benefit Life Insurance Company, a corporation, under the deed of trust executed by said Vincil Mildred and Mildred E. Mildred, here involved.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.