# ANNA H. ZEHNDER v. WILLIAM P. STARK, Appellant.

### Division One, February 28, 1913.

1. **FRAUDULENT CONVEYANCE: Unrecorded Deed: Misde-scription in Lien Contract: Notice.** The vendor of fruit trees who sells under a written contract which gives him a lien on the land for the trees sold and which does not correctly describe the land and whose description is given to the scrivener by the land owner, is not chargeable with notice of the true land description, nor with culpable negligence in trusting the owner to give it correctly, where the deed conveying the land to such owner was not recorded.

2. **————: Matters Settled in Suit for Debt.** Where the indebtedness of a vendee of fruit trees was merged in a judgment against him, the defenses that the trees were not as represented and that some were defective and did not grow, are not available in a suit, by the purchaser at a sheriff's sale under such judgment, to have set aside as fraudulent a deed to the land made by said vendee to his. wife.

3. **FRAUD: Intent: Inferred from Facts.** Fraud does not rest on mere conjecture, surmise or suspicion; but when facts and circumstances exist from which a legitimate inference of fraudulent intent should be drawn, fraud may thereby be sufficiently established for the purpose of dispensing justice.

4. **————: ————: ————: Husband and Wife.** The relation of husband and wife affords a convenient and much-used cover for transactions designed to screen property from creditors. Courts eye such transactions with jealousy to see that they do not hide and consummate fraud—the latter being easy to accomplish, and hard to prove.

5. **————: Use of Two Names: Husband and Wife.** The use by the husband of two names, when one of them happens to be the name of his wife, and where cunning is adopted as a line of family policy, is not without significance as intended to artfully screen the situation.

6. **————: ————: Adopting Fraudulent Act of Husband with Knowledge.** If the husband, in assuming to do an act which will be for the benefit of his wife, commits a fraud which inures to her benefit, and she, after knowledge of that fraud, seeks to avail herself of it and to retain the benefit of it, she must be held to adopt the whole act, fraud and all.

7. ————: ————: ————: Resulting Trust: Use of Wife's Money: Estoppel. Where the wife participated in the fraud of the husband, by which he purchased a large amount of fruit trees and by written contract gave the vendor a lien on the land to secure the purchase price of the trees, and therein wrongfully described the land, keeping his deed off of record for thirteen years, and when he was sued for the debt conveyed the land to her with the very purpose of preventing the vendor from collecting a debt created for its improvement, and she accepts said deed knowing its fraudulent purpose, and clearly knowing of the improvement and that the debt had never been paid, she is estopped to assert that her husband wrongfully misappropriated her money as her trustee and used it in purchasing the land without her knowledge and consent, and that she is entitled to a resulting trust in the land because her money was so used. In such case the married women's enabling acts, whereby a husband may not appropriate his wife's separate estate to his own use except by her written consent, afford no protection against a creditor of her husband.

Appeal from Butler Circuit Court.—*Hon. Jesse C. Sheppard,* Judge.

REVERSED AND REMANDED (*with directions*).

*David W. Hill* for appellant.

(1) A married woman, as to persons other than her husband, may be estopped in relation to such property rights like any other property owner. Leete v. Bank, 115 Mo. 184; Tennant v. Insurance Co., 133 Mo. App. 361; Riley v. Vaughan, 116 Mo. 169; Balz v. Nelson, 171 Mo. 689; Taliaferro v. Evans, 160 Mo. 380; Mfg. Co. v. Stephens, 169 Mo. 1; Stone v. Bank, 81 Mo. App. 9; Orchard v. Collier, 171 Mo. 390. (2) Coverture is no defense in equity for fraud. Truesdail v. McCormick, 126 Mo. 39. (3) A resulting trust must be established by testimony so clear, strong and unequivocal as to banish every reasonable doubt from the mind of the chancellor respecting the existence of such trust. Zehnder testified in the former suit that he purchased the land in controversy as his own. Mrs. Zehnder, in this case, testified that she was not pres-

ent when the land was purchased and never saw the cash payment made and therefore cannot swear that such a payment was made. She does testify that .she paid some of her husband's notes which were given for a portion of the purchase price, but she does not swear how many of such notes she paid. The testimony falls far short of showing a resulting trust in this case. Reed v. Sperry, 193 Mo. 173; Garrick v. Garrick, 171 Mo. 155; Brinkman v. Sunken, 174 Mo. 709; Heil v. Heil, 184 Mo. 665; Crawford v. Jones, 163 Mo. 577; Curd v. Brown, 148 Mo. 82; Walker v. Walker, 147 Mo. 246. (4) To render a voluntary conveyance by a husband to his wife valid, as against prior creditors, the burden of proof is on the grantee to show that the debtor retained sufficient property to pay his debts. Hoffman v. Nolte, 127 Mo. 120; Bank v. Nichols, 202 Mo. 309. (5) If this deed had the effect to transfer the property to his wife, he was thereby rendered insolvent, for he had no other property, as his wife testified, and the attempted transfer is presumptively fraudulent as to Zehnder's creditors. Snyder v. Free, 114 Mo. 360; Scharff v. McGaugh, 205 Mo. 344; Swinford v. Teegarden, 159 Mo. 635; Stivers v. Horne, 62 Mo. 473; Benne v. Schnecko, 100 Mo. 250. (6) The expressed consideration of five hundred dollars in the deed from Zehnder to his wife was shown, by the evidence, to be entirely fictitious, and the deed was therefore void as to Zehnder's creditors. Seger v. Thomas, 107 Mo. 644; Taliaferro v. Evans, 160 Mo. 38. (7) Mrs. Zehnder knew that her husband purchased the fruit trees and that they were planted on the farm in controversy which was improved thereby; she is therefore estopped from denying Stark Brothers' title. Shea v. Shea, 154 Mo. 599. (8) According to Mrs. Zehnder, she ratified the contract made with her husband and Nickey even to taking the title in his name, and cannot now, in the face of his creditors, deny her husband's title. Matthews v. French, 194

Mo. 553. (9) Mrs. Zehnder's long acquiescence (fourteen years) in and enjoyment of the fruits of a transaction had on her behalf by her husband-agent is a ratification of the transaction. Barrett v. Davis, 104 Mo. 549. (10) Mrs. Zehnder swore that she ratified the contract made by her husband-agent in purchasing the land, and she accepted the fruit trees purchased by him, which were planted on this farm and she is therefore estopped to deny the obligations made by him in this regard. Bohlman v. Rossi, 73 Mo. App. 314; Hoppe v. Saylor, 53 Mo. App. 4. (11) Zehnder could not donate all of his labor to his wife and defeat his creditors. Johnson & Co. v. Christy, 79 Mo. App. 46. (12) The deeds of trust signed by Zehnder and his wife contained recitals that Zehnder was the owner in fee simple of the land in controversy and the wife is now estopped from asserting to the contrary. Whythe v. St. Louis, 153 Mo. 90; Bush v. Beirsol, 183 Mo. 500. (13) The last sheriff's deed made to the defendant, conveying the land in suit, was made by virtue of a sale under the judgment which the Supreme Court directed the circuit court to enter. Stark v. Zehnder, 204 Mo. 442.

*E. R. Lentz* for respondent.

(1) The undisputed testimony in this case, is, that Zehnder purchased the land in controversy, paying therefor the sum of eleven hundred dollars. That at the time he bought the land he paid two hundred dollars in cash, using his wife's money in making that payment. He also gave nine promissory notes for one hundred dollars each, representing the balance of the purchase money. The last of these notes matured in fifty-four months from the date thereof. That all of said notes were paid out of the sole and separate property of the plaintiff. That all the money which the plaintiff had, she received during the existence of the

marital relation between her and her husband, by inheritance from her father and mother and by gifts from her brothers and sisters. That without her knowledge or consent the title to the said land was taken in the name of her husband, and thereafter the husband made a deed conveying the said land to his wife, in execution of the trust upon which he held the land. The money which plaintiff received and paid on this land, together with all income, increase and profits, was her separate property, free from the claims of her husband or his creditors. She did not transfer it to her husband by his use, occupancy or control thereof, but the same remained her separate property, unless by the terms of her assent in writing, full authority was given him. The property into which it was invested became trust property for her sole use and benefit, if she so elected. And this too whether she directed the purchase or not. R. S. 1909, sec. 8309; R. S. 1899, sec. 4340; R. S. 1889, sec. 6869; Grocer Co. v. Baffinger, 137 Mo. 373; Seay v. Hess, 123 Mo. 456; Winn v. Riley, 151 Mo. 66; Hurt v. Cook, 151 Mo. 426; Broughton v. Brand, 94 Mo. 174; McCoy v. Hyatt, 80 Mo. 136; Rogers v. Bank, 69 Mo. 562; Blake v. Meadows, 225 Mo. 1. (2) Both Mrs. and Mr. Zehnder testified that the money used in the purchase of this land in controversy, was the separate means and money of Mrs. Zehnder, that the money came to her by her inheritance from the estates of her father and mother, and by gift from her brothers and sisters, during the existence of the marital relations between them. In either event it was her separate estate. This evidence is not contradicted by direct testimony, nor by any legitimate inferences from the evidence, it is not opposed to the probabilities, nor in its nature surprising or suspicious. It is therefore conclusive, and the court when sitting as a trier of a fact is not at liberty to disregard it. Bank v. Weston, 172 N. Y. 250; Hull v. Littauer, 162 N. Y. 569; Littlefield v.

Lawrence, 83 N. Y. App. Div. 327; Daniels v. Foster, 26 Wis. 686. (3) To constitute estoppel by conduct, five things must concur in order to work such estoppel: there must have been a false representation or a concealment of material facts; the representation must have been made with knowledge of the facts; the party to whom they were made must have been ignorant of the truth of the matter; it must have been made with the intention that the other party should act upon it; the other party must have been induced to act upon it. Bigelow on Estoppel (3 Ed.), 484; Blodgett v. Perry, 97 Mo. 273; Acton v. Dooley, 74 Mo. 74; Brammell v. Adams, 146 Mo. 82. There is no testimony that even Zehnder ever made any representations to Stark Bros. concerning the ownership of this land. The only representation which it is claimed or shown that Zehnder made was that contained in the several contracts, which he is alleged to have signed and that only with reference to the land described in those contracts, not the land in controversy. But even this is shown to be without the knowledge of the plaintiff. There is no pretense here that Mrs. Zehnder ever made any representations of any kind to Stark Bros. or that she ever concealed anything, or that she ever remained silent when it was her duty to speak or when she had an opportunity to speak.

LAMM, J.—Plaintiff sued under former section 650 (now 2535, R. S. 1909) to try, determine and adjudge title to the south one-half of the southeast quarter of section 27, township 25, range 6, in Butler county, and clear away the cloud of two sheriff's deeds purporting to convey it to defendant. From her decree, defendant appeals.

The form of the bill is not challenged.

The answer denies plaintiff's title and avers that defendant's sheriff's deeds mentioned were operative to convey the land and vest title in him. It then, in

twelve specifications, sets up estoppel and fraud to defeat plaintiff's title and prays for affirmative relief, viz.: to clear away the cloud of a certain deed under which plaintiff claims. As the sufficiency of the answer is unchallenged, the specifications of fraud and estoppel may be passed by with the remark that they were definite and substantial enough to admit proofs educed in support of them.

The replication was conventional.

A brief preliminary outline of the case is this:

Plaintiff is the wife of *John G.* A. H. Zehnder and has been during all times in hand. It will be observed that her name is Anna H., and that, by dropping the "John G." from his surname, his and **Name: Husband and Wife: Same Initials.** her name have the same initials. Now, the testimony shows her husband dropped the "John G." part of his name in use and signed as "A. H. Zehnder," that he was known by that name; that he did business under that name except apparently in the matter of taking title to the land in question and in conveying it, when he used his full cognomen. Of the significance of this similarity of names, when so clipped, and the convenience of the use of the same name by both, we will speak again. John G. A. H. Zehnder was a butcher and plied his trade in St. Louis and then, from 1889 or 1890 onward, in Poplar Bluff. On the 19th of August, 1891, he took title to the land in suit by warranty deed from one Nickey. The consideration expressed is $1100 in hand. In fact, however, **Other Facts.** but $200 was paid down and $900 of the purchase price was evidenced by his individual notes for $100 each, payable one every six months, secured by a deed of trust on the land, notes and deed of trust executed only by himself signing as "John G. A. H. Zehnder." These notes were severally paid as they matured and the lien of the deed of trust lifted. The Nickey-Zehnder deed was kept off record for about

one year and then spread thereon. Nearly thirteen years later (the land being in the meantime always assessed to him) he conveyed to her by a warranty deed for an expressed consideration of $500, which deed was recorded four months after it bore date. This is the deed challenged by defendant in this suit and relied on by plaintiff to confer title on her. The consideration nominated in the deed was wholly simulated, i. e., nothing, not even the traditional "peppercorn" of the old books, was paid. According to her own testimony, as we read it (of which more presently), plaintiff knew for, say, nine years that title stood in her husband's name and with that knowledge she did not request a deed to be made to her at any time, nor was it made as the result of any negotiation between her and him disclosed by this record. In other words, she rested content. Nor if her testimony is to be given credit, did she know of it, when it was made, for some time afterwards. She merely adopted his act, when she found it out. Whether it was delivered, other than by the constructive delivery springing from its record, is also dark.

Between the time Zehnder took title from Nickey and the date of his conveyance to his wife things happened we will now relate. Zehnder, it seems, had two ends in view in buying the land, viz.: a site for a slaughter house appurtenant to his trade as a butcher, and to grow a great orchard. Shortly after getting title, *but before the record of his deed,* he entered into three several written contracts with Stark Brothers, nurserymen of Louisiana, Pike county, for fruit trees. The contracts were drawn by a field agent of Stark Brothers and forwarded to them for acceptance and signing. The deed not being recorded, Stark Brothers are not charged with notice of the true land description, nor with culpable negligence in trusting Zehnder to give it correctly. These contracts were made at different dates

**Notice of Description.**

within a limit of a few months, and (*mutatis mutandis*) were in the same terms. Zehnder owned no other land in the county and in order to get said trees from the nurserymen he offered to give them a lien on the land in suit and this offer was accepted. It is clear he assumed the office of giving the land numbers to the scrivener, who (without information of his own) relied on him for them, but in doing so Zehnder put the land in section "25" instead of *27*, as the fact was. As tall oaks from little acorns grow, so the great trouble in this case arose from changing a "7" to a "5," whereby the wisdom of Solomon's hint in his "Song" is confirmed about the little foxes that spoil the vines. The contracts were executed with this misdescription, and gave a lien on the misdescribed land to secure the purchase price of the fruit trees in annual payments covering ten years, aggregating the rise of two thousand dollars. They were signed "A. H. Zehnder," and duly acknowledged and promptly recorded. Why he took title in one name and assumed to give a lien on the land in another is left unexplained. The contracts further described the land as "his home farm," with "a perfect title," etc., and confessedly on the strength of those contracts he got from Stark Brothers on credit some eight or ten thousand fruit trees to be planted on the land thus acquired from Nickey. They were received by him and delivered and planted (not on the land described in the contracts, but) on "his home farm," the right land.

(*Note*: There was some contention that these fruit trees were not as represented, that some were defective and did not grow, the details of which are immaterial because the indebtedness of Zehnder to Stark Brothers has been merged in a judgment and the amount is no longer open to reagitation. It has passed into a thing adjudged. Stark v. Zehnder, 204 Mo. 442.)

Zehnder, in default in paying, in 1903 was being pressed therefor and then, for the first time, Stark Brothers discovered said land misdescription—a thing known to Zehnder, if not from the start, at least for six or seven years, and kept to himself, he says. Refusing to pay, they brought a suit in equity against him to correct the misdescription, reform the contracts in that particular, foreclose the contract lien as reformed, and for a money judgment for the price of the trees with interest accrued, properly filing at the same time a statutory notice of *lis pendens*.

Some three months thereafter, Anna H. Zehnder made application to be made a party defendant and was allowed to come in in that suit. Thereupon on the 18th of February, 1904, she filed an answer.

(*Note*: It will be observed that after suit brought and notice of *lis pendens* filed, her husband, as said, conveyed to her).

In that case her position was that her husband purchased the land acting "as her agent" (Stark v. Zehnder, 204 Mo. l. c. 447), that her money having paid for it, it belonged to her as against his creditors, that he took title in himself without her knowledge or consent. Furthermore, she, as did her husband, defended against the reformation of the fruit-tree contracts on the theory plaintiffs' cause of action on that head accrued to them at once upon their execution, hence, as ten years had gone by, the ten-year Statute of Limitations ran as a defense. Steps were taken in that case resulting in a decree below in favor of Stark Brothers on all the issues. From that decree the Zehnders appealed without giving bond. The case was brought up in such form that we were confined to an examination of only the record proper. The result was the money judgment against Zehnder was held valid, but the defense of the plea of the Statute of Limitations was held good on the issue of reformation on the face of the record proper—this, since Stark

Brothers did not plead any recognized exceptions taking the case out of such statute. As there was no contention made in that case by Stark Brothers that Mrs. Zehnder was personally bound for the money price of the fruit trees, this holding dismissed her out of the case. Accordingly the judgment was reversed and the cause remanded with directions to enter a money judgment against Zehnder and deny reformation. But nothing was decided in that case precluding defendant in this case on the question of fraud or estoppel.

Pending that appeal an execution was issued on the judgment below and the land sold under the sheriff's hammer, the defendant in the present suit bidding it in on behalf of the firm of Stark Brothers, taking a credit on the execution for his bid and receiving a sheriff's deed in his own name. That deed is one of those struck at by plaintiff in the present suit. Defendant's counsel, as we read his brief, does not now contend that the reversal of that judgment did not operate to avoid that particular deed—this, since the testimony does not tend to show that defendant was a purchaser of the character that could hold title on an execution sale made on a judgment subsequently reversed, hence that deed will be no further noticed. Presently, however, when by virtue of our mandate the new judgment was entered against Zehnder, another execution issued and the land, levied on and sold as his property, was again bid in by defendant on account of Stark Brothers and he, as a member of that firm, received a sheriff's deed in due form. This last deed is the second one attacked by plaintiff in the present suit, and is the one on which defendant relies.

I. There are certain guiding general propositions in the light of which the case must be viewed—among them, these:

Zehnder v. Stark.

(a) However abhorrent fraud is and however astute courts are to detect it in its shade and concealment and snatch away its fruits, yet it does not rest on mere conjecture, surmise or suspicion; this because a presumption runs in favor of honesty and fair dealing. However, when facts and circumstances exist from which a legitimate inference of fraudulent intent should be drawn, it may be deemed thereby sufficiently established for the purpose of dispensing justice. Such is the doctrine of this court, and the general rule as well. [Black v. Epstein, 221 Mo. 286; St. Francis Mill Company v. Sugg, 206 Mo. 148; Bank v. Hutton, 224 Mo. 1. c. 71, et seq.; Troll v. Spencer, 238 Mo. 1. c. 101-2.]

*Fraudulent Intent.*

(b) A virile and scholarly law writer, with a knack of independent thinking, has rescued from the superimposed dust of years some wise observations of Mr. Justice Grier anent fraud (made to a jury) which we deem it not space misapplied to reproduce as live verities in philosophy and law (that writer terms those observations "prophylactic," and we think they are. 1 Moore on Facts, sec. 53.), viz.:

*Observations of Grier, J.*

" 'Every honest mind hates it, and even those who practice it themselves will join in the denunciation of it. It makes them feel virtuous for the time, and they are the most ready, from the arguments of conscience, from judging of others by themselves, to believe it true, and inveigh most loudly against it. When the clamor of fraud is raised in a community, or when it is confidently charged by counsel in a court, we are prone to see all facts through a false medium, which magnifies the importance of every fact upon which suspicion of fraud may be raised, and ignores the plainest inference against it. In the midst of our virtuous indignation against fraud, we first assume it has been committed, and then seek for arguments to confirm, not our judgments, but our prejudice.

"Trifles, light as air," then become "strong as proofs of holy writ." Circumstances which to an unprejudiced mind are just as compatible with innocence as guilt, which at best could only raise a suspicion, are set down as conclusive evidence of crime. Those who sit in judgment over men's rights, whether as courts or jurors, should beware of this natural weakness to which we are almost all of us subject. We all fancy ourselves wiser than perhaps others are willing to give us credit for. This feeling is gratified by what we believe to be superior sagacity. Rogues may be cunning, but they can't deceive *us*. Under this satisfactory belief, we become over-astute, and often see that which is not to be seen. We suffer our imaginations to take the rein from our judgments, and rush headlong in this chase after the fox called fraud. Circumstances which should avail for the proof of fraud are such only as are inconsistent with a contrary view of the transaction, and lead irresistibly to that conclusion.' "

(c) But when the warning in the foregoing excerpt is heeded, there is another to be reckoned with, to-wit: He would be a dull observer of the affairs of mankind whose powers of comprehension and appreciation were so *in vacuo* that he did not recognize the relation of husband and wife as affording a convenient and much-used cover for transactions designed to screen property from creditors. Accordingly when in pursuit of fraud courts eye such transactions with jealousy to see they do not hide and consummate fraud, the latter being easy to accomplish and hard to prove. [Cole v. Cole, 231 Mo. l. c. 255.]

*Husband and Wife.*

There are cases riding off on one, and those riding off on another of those propositions. Sometimes there seems to be a note of discord in the case law. The right doctrine would seem to lie along a line chalked out by approximation ("by pinpricks," to

borrow a phrase of Mr. Justice Holmes, used in another connection) giving full play to the general principles announced above, and letting each case break on its own peculiar facts.

II. The ultimate and main question in the case at bar is this: Are there present such elements of fraud as vitiate the title Mrs. Zehnder acquired from her husband, or such elements of estoppel as preclude her asserting title as against Stark Brothers' claim? If there are, then defendant as execution purchaser, standing in the shoes of Stark Brothers, has a better title under his deed than she has under hers.

In disposing of that question the facts heretofore stated will be assumed as true, the guiding propositions announced in the foregoing paragraph will be applied, and other material facts will appear further on in the course of the opinion.

There is testimony tending to show that Mrs. Zehnder inherited some money from her father and mother and received presents of money from her brothers and sisters—all since the passage of our married woman's enabling acts. There is testimony that some of this money was invested in real estate in her own name. There is testimony that some of this money was by her turned over to her husband from time to time and by him used to support the family and to aid him in the butcher business. How much of it was turned over to him is not disclosed. If her testimony is to control, he had nothing and she had everything for all time thereafter. Her testimony on this head, however, is vague and unsatisfactory. It is by way of an amusing argument running this way: 'We had to live; we met with losses (fires, etc.); our living expenses and losses account for his having nothing and my having all the tangible property. It will be observed that by such line of reasoning all the losses and living expenses

*Family Support: Wife's Money.*

are apparently disposed of by assuming they came out of his property, while the truth is that the record does not disclose that to be a fact, or make any disclosures at all on that line, as we read it.

She claims this butcher business was run in her name, but we think her claim is not sustained. In the first suit her contention was that her husband was her *agent*, in the present suit her contention is that he was her *trustee*. But there are facts and testimony, we think, leading to the reasonable conclusion that he was doing business in his own name with her knowledge and consent, and we lay some stress upon the unhappy use of the name "A. H. Zehnder" in this business.

Use of Wife's Name. The use by the same person of two names when one happens also to be the name of that person's wife, as in this instance, is not without some little significance as intended to artfully screen the situation, where cunning is adopted as a line of family policy, as seems to be the case here. During part of this time Zehnder was in a partnership, under the name of "A. H. Zehnder" with one Scott. His partner, singularly enough, knew nothing of Mrs. Zehnder being a member of the partnership. So the community knew nothing of Mrs. Zehnder being in business under the name of "A. H. Zehnder." There is no testimony he drew a salary or was accounting to her as her agent or trustee—none of the usual *indicia* of such relation. No books or bank account was produced showing she owned or handled this business or had any interest in it. If she appeared now and then at his place of business (as she did) it is not shown it was in the capacity of owner or principal or otherwise than as a wife might visit her husband's shop. He transacted all the affairs of the business without guidance from her—buying, selling, paying, collecting, running in debt so far as the world knew as a trader on his own hook. It was from this butcher business that the advance payment was made on the

Nickey farm and that the most of the other payments were made. It is of significance that the testimony shows that Zehnder claims to have *borrowed* that money from his wife and that the deed, absolute in form, was made to *secure* her for that indebtedness, $2000, but unfortunately for that theory no notes, book accounts or memoranda of any sort, kept by either, are in this record tending to show that fact. It smacks of an afterthought. Not only so, but she repudiates the idea of a "loan." Her claim, as we see it, is that her husband wrongfully misappropriated her money as her trustee and used it in the purchase of the Nickey land without her knowledge or consent. She wants to follow a trust fund into the property. He (as she claims) was seized to her use and merely executed the use when he conveyed to her. But unfortunately for that claim and theory there are facts tending to show, we think, that she knew from the outset he had bought the property in his own name and knew from the outset he used it as a basis of credit and had gone in debt in a large amount for fruit trees to improve it. This despite her testimony to the contrary.

"Evidence of whatever description must yield to the extent that it conflicts with admitted or clearly established facts." [1 Moore on Facts, p. 11.] Applying that rule, we find she was on the Nickey farm from the start almost daily, knew when the fruit trees arrived, took a live interest in the rather ambitious project (evidently one of family conversation) and puts herself in the attitude of knowing (as she says) that he had no money to pay cash for them.

That about $400 of her undoubted money went into the purchase of the farm seems clear. That money came from a sale of a piece of real estate owned by her in her own name. But the testimony showing that also shows that she voluntarily and knowingly used it to pay off some of the instalments of the pur-

chase money for the Nickey farm when they came due, knowing at the time the title was in him. Her denial in this behalf must go for naught in the face of her admissions and the physical facts shown to exist.

That Zehnder, himself, planned a fraud on Stark Brothers is put beyond question. This is so although it be admitted that his original mistake in the description of the real estate was an innocent one. His keeping his deed off of record for ·a year may also have been innocent, but his concealment of the mistake in description for several years after he found it out can scarcely bear that interpretation, nor his execution of the contracts in the name of "A. H. Zehnder" thereby permitting him to claim one way or another on his or her liability. His making of this deed without consultation with his wife, without any request or demand from her, after he was sued, presents unmistakable evidence of fraud on his part. If he owed her $2000 (as the evidence shows his claim to be), the honest thing, even on his own theory, would have been to have secured it by a mortgage on the farm. But we will not pursue the question of his fraud; for her case at bottom proceeds on the theory he was a scamp in wrongfully misappropriating trust funds to his own use. The vital question is: Did she participate in his fraud? Or is she estopped? We are constrained to hold that when, without protestation on her part, and on knowledge of the fact, she allowed the title to remain in him for thirteen years and finally accepted a deed made for the very purpose of preventing Stark Brothers from collecting a debt created for the improvement of the land conveyed—a deed made because of the exigencies of a pending law suit—such facts must be held to make out a case of her participating in his fraud, wherefrom she holds a tainted title.

For what says the law? "The rule is general, that, if one who assumes to do an act which will be for the benefit of another, commits a fraud in so doing,

and the person to whose benefit the fraud will enure seeks, after knowledge of the fraud, to avail himself of that act, and to retain the benefit of it, he must be held to adopt the whole act, fraud and all . . . '' [Per ALLEN, J., in Atlantic Mills v. Indian Orchard Mills, 147 Mass. 1. c. 275.]

Such facts also work estoppel. In cases of fraud and estoppel of the character dealt with here, the married women's enabling acts whereby a husband may not appropriate his wife's separate estate to his own use, except by her written consent, afford no protection against a creditor of her husband. [Hudson v. Wright, 204 Mo. 1. c. 432; Blake v. Meadows, 225 Mo. 1. c. 28, *post* and *ante*; Leete v. Bank, 115 Mo. 1. c. 184.]

Assuming Stark Brothers are not entitled to reform their contracts, as held in the first case, yet if they can have relief on equitable principles in the present case, it is one that on all the facts loudly cries out for it. We hold they can have such relief. In not giving it the chancellor erred.

Let the judgment be reversed and the cause remanded with directions to enter a decree in favor of defendant divesting the title acquired by plaintiff through her husband's deed out of her, and vesting title in him to the described eighty acres under his last sheriff's deed. It is so ordered. All concur.