UNITED STATES of America, Plaintiff,

v.

Robert JONES, Dona Jones, City of Lotawana, H. Britt Carlson, personal representative of Naomi Jones, deceased, Robert O. Jones, Jr., Defendants.

No. 82–0661–CV–W–5.

United States District Court,
W.D. Missouri W.D.

Feb. 12, 1986.

Kenneth Weinfurt, Asst. U.S. Atty., Kansas City, Mo., David House, Trial Atty., Tax Div., Washington, D.C., for plaintiff.

C.W. Crumpecker, Jr., Swanson, Midgley, Gangwere, Clarke & Kitchin, Kansas City, Mo., for defendants.

### MEMORANDUM AND ORDER

SCOTT O. WRIGHT, Chief Judge.

This suit was brought by the United States to set aside as fraudulent a conveyance of real property owned by defendants Robert and Dona Jones. The case came to trial before the Court on January 7, 1986 with jurisdiction under 26 U.S.C. § 7402 and 28 U.S.C. §§ 1340, 1345. Based on evidence presented at trial and briefs submitted by the parties, the Court makes the following Findings of Fact and Conclusions of Law.

*Findings of Fact*

This action arises out of the failure of Robert and Dona Jones to pay federal income taxes for a period spanning more than twenty years. Robert Jones is an attorney admitted to practice in Missouri. He and his wife reside at 8900 Delmar Place, Prairie Village, Kansas. The Joneses pattern of practice has been to file tax returns, but not pay the tax shown due. Assessments were made against them for unpaid federal income taxes for 1958 through 1969, and for 1973 through 1980. The 1958–63 assessment was for $118,000, but was never reduced to judgment and the statute of limitations on collections expired without their being paid. The remaining assessments have been reduced to judgments with over $200,000 remaining unpaid. The United States filed federal tax liens against the Joneses in Johnson County, Kansas, and Jackson County, Missouri.

The real property in question is described as Block 2, Lot 10, Lake Lotawana, Jackson County, Missouri. The Joneses pur-

chased the lake property for $39,000, from Lisle and Lilyan Hughes by warranty deed dated September 12, 1962. The Joneses assumed a mortgage in favor of Westport Bank with a balance due of $24,804.71. They gave a second mortgage to the Hughes for approximately $5,000.

In the early 1960's, particularly 1963, the Joneses fell in financial straits. In June, 1963, $12,000 in unpaid 1961 federal income taxes were assessed against them. This was filed as a tax lien against their main residence, the Delmar property, in August, 1963. On September 5, 1963 a foreclosure sale was set by the Westport Bank against the lake property. This was forestalled by Robert Jones' parents paying the $2,000 he was in arrears.[1]

On September 19, 1963, the Joneses received notice of foreclosure of the Hughes mortgage. The Hughes accelerated the note and would not accept back payments. Robert Jones testified his parents paid the $5,000 with the stipulation that the Joneses would deed the lake property to the parents for them to keep in trust for Robert's son, Robert, Jr.[2] At this same time, the Joneses were having problems with the Delmar property. A foreclosure sale was actually held on November 25, 1963, and Jones had six months or until May 25, 1964, under Kansas law, to redeem it.

Robert Jones was unable to refinance the Delmar property on his own. On May 22, 1964, Jones' then law partner, Gene McDaniel, obtained a loan to redeem the Delmar property. That same day, the Joneses deeded that property to McDaniel. Only three weeks prior, on May 1, 1964, the Joneses had similarly deeded the lake property to Robert's parents. Subsequent to both these transfers, the Joneses continued to pay the mortgage, utilities, and insurance on both pieces of property. They continued to live at the Delmar property and they and their children and Robert's parents, had exclusive use of the lake property.

In 1981, McDaniel instituted an action against the Joneses to quiet title to the Delmar property. In the March, 1982 trial of that action, Robert Jones claimed that he considered himself the owner of the Delmar property. "I conveyed the property to Gene [McDaniel], but I was always the owner of the property."[3] Jones further explained, "My understanding with Gene [McDaniel] was that anytime my tax matters and tax problems were reconciled and satisfied that he would deed the property back to me or any person that I designated, and I would pay him nothing for that deed because he had been out-of-pocket no money."[4]

During the 1982 trial, Jones was examined about deductions taken on his 1975 joint federal income tax return for mortgage interest and real property tax. When asked, "What other real property did you own then [in 1975]?", he replied, "A piece of property out at Lake Lotawana.[5] It was a result of this testimony that the United States first became apprised of the Joneses' interest in the lake property.

During the present trial, the only evidence presented on behalf of defendants Robert and Dona Jones, was testimony by Robert Jones, much of which was uncorroborated. Jones' credibility was severely impeached by a number of glaring inconsistent statements. Jones testified that he has not owned the lake property since he conveyed it to his parents in 1964. Yet as already touched upon, at the 1982 trial, Jones claimed under oath that he owned the lake property when he took mortgage interest and real property tax deductions on not only his 1975 income tax returns,

---

1. There is no evidence of this payment other than oral testimony from Robert Jones. As will be explained *infra,* his credibility has been severely impeached.

2. Once again, there is no written agreement to this effect, or evidence of who paid the $5,000 other than Robert Jones' testimony.

3. Plaintiff's Exhibit No. 59, p. 38, l. 13 of *McDaniel v. Jones* transcript.

4. *Id.,* p. 31, l. 17–21.

5. *Id.,* p. 46, l. 18–19.

but also on his returns in 1976, 1978, 1979, and 1980.[6]

At the present trial, Jones testified that he had no income tax problems at the time he conveyed the lake property on May 1, 1964. However, the $12,000 tax lien on the Delmar property was not paid off until at least May 22, 1964, when McDaniel obtained the loan for him. Furthermore, at the 1982 trial, Jones testified that in 1964 he had "... '62 and '63 taxes which were probably then not paid .... There hadn't been a tax lien filed yet, but I think that they were probably due and owing at that time.[7]

Two more inconsistent statements concern the Delmar property. In 1971, Jones signed a statement of financial condition for the IRS. One question concerned transfer of property for less than full value. Jones did not list the Delmar property although McDaniel had not paid a penny for that property being deeded to him. When asked to explain the inaccuracy, Jones tried to place blame on his tax accountant who completed the form. Yet as a practicing attorney since 1952, he certainly would or should have perused the document before signing it.

On September 13, 1967, over three years after deeding the Delmar property to McDaniel, the mortgagee, Prudential, requested a signed affidavit from Jones that McDaniel was in fact the owner, and that Jones was merely a month-to-month tenant. Yet his testimony at the 1982 trial was completely opposite. Here is still another example of Jones saying whatever is most opportune for the circumstances in which he finds himself.

A final example of impeaching testimony occurred when the government cross-examined Jones about a number of boat registrations for Lake Lotawana in his father's name. These were admitted into evidence by defendants to allegedly prove the parents' ownership of the lake property. Jones confidently testified that his father signed them all, including the one dated

from 1977. He was then immediately asked and had to admit that his father in fact had died in 1975.

These five examples are but the most glaring which led the Court to find Robert Jones' testimony should be given little weight in determining whether there was a fraudulent conveyance of the lake property.

### Conclusions of Law

■ A tax lien arises in favor of the United States against all property and property rights of a person who fails to pay a tax assessment. 26 U.S.C. § 6321. The lien arises on the date of assessment and continues until it is paid in full or the statute of limitations on collection expires. 26 U.S.C. § 6322. When an assessment has been reduced to judgment, there is no period of limitations on collection and the lien remains enforceable.

Since the assessments in issue have been reduced to judgment, the tax liens of the United States are enforceable. The state statute of limitations and the doctrine of laches do not bar the instant action. *United States v. Wurdemann,* 663 F.2d 50, 51 (8th Cir.1981); *United States v. Fernon,* 640 F.2d 609, 612 (5th Cir.1981). Thus, the fact that the transfer in this case occurred twenty years ago does not bar the United States from bringing this suit.

■ If a taxpayer transfers property prior to the time a tax lien arises, the United States may set aside the transfer if it is fraudulent under the law of the state where the property is located. *United States v. Kaplan,* 277 F.2d 405, 408 (5th Cir.1960). Since the lake property is located in Missouri, the transfer to Robert Jones' parents may be set aside if it is fraudulent under Missouri law.

A transfer made to hinder, delay or defraud creditors is void as to both existing and subsequent creditors. R.S.Mo. § 428.-020. Fraudulent intent is rarely proven

---

6. *Id.,* p. 46–48.

7. *Id.,* p. 24, lines 13–18.

directly. Rather, it is usually established by circumstantial evidence, the most common of which are referred to as "badges of fraud." The Missouri courts have listed them as being:

1) Conveyance to a near relative;
2) Conveyance in anticipation of suit;
3) A transfer of all or nearly all of a debtor's property;
4) Insolvency;
5) Inadequate consideration;
6) Unusual clauses in instruments or unusual methods of transacting business;
7) Retention of possession by the debtor; and
8) The failure to produce abutting evidence when the circumstances surrounding the transfer are suspicious.

*Thomas v. Shoots,* 651 S.W.2d 663, 665 (Mo.App.1983).

■ The transfer in question exhibits many "badges of fraud." It was to Robert's parents. It occurred near a time when the Joneses were facing three different foreclosure actions and federal tax liens. The contemporaneous transfers of the lake property and the Delmar property resulted in the transfer of almost all the Joneses' assets. The Joneses were insolvent at the time of transfer. The alleged consideration was less than one-sixth the purchase price of less than two years before. The transfer was subject to a secret trust in favor of the Joneses and their son. The Joneses had unlimited use of the property and bore substantially all the burdens of ownership.

When several "badges of fraud" are present, as here, a presumption of fraud arises. *Thomas v. Shoots, Id.* The burden then shifts to the defendants to prove the transfer was not fraudulent. *Allison v. Mildred,* 307 S.W.2d 447, 454 (Mo.1957).

---

**8.** This is a defendant who was admitted to practice law in the State of Missouri in 1952. At the time of his admittance he took an oath to uphold the laws and Constitution of the State of Missouri and the United States. He not only has not upheld those laws but he has used every scheme possible, fraudulent and otherwise, to

While Robert Jones testified that the transfer was made without fraudulent intent, his discredited testimony is insufficient to rebut the presumption of fraud. Based upon the numerous indicia of fraud, and there being no countervailing argument supported by believable evidence legitimizing the transfer, the conveyance of the lake property from the Joneses to Robert's parents is fraudulent under R.S.Mo. § 428.-020.[8]

Accordingly, it is hereby

ORDERED that the transfer of real property described as Block 2, Lot 10, Lake Lotawana, Jackson County, Missouri, is void and should be set aside. The tax liens of the United States therefore attach to the property and may be foreclosed.

avoid paying his income taxes. It seems incredible that a bar association that purports to police its members would not make an investigation to determine the fitness of this defendant to continue to practice law in the State of Missouri.