SECURITY COUNSELORS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Security Counselors, Inc. v. Commissioner
Docket No. 14001-87
United States Tax Court
T.C. Memo 1989-580; 1989 Tax Ct. Memo LEXIS 566; 58 T.C.M. (CCH) 506; T.C.M. (RIA) 89580; October 26, 1989
Lawrence H. Weltman, for the petitioner. *567 Robert J. Burbank, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined that Security Counselors, Inc., is liable as transferee of the property of Rocky Mountain Investment Properties, Inc., for the following deficiencies in income tax and additions to tax: Taxable
Section
Section
Year Ending
Deficiency
[1] 6653(a)(1) 6653(a)(2)
May 31, 1983
$ 99,824.01
$ 4,991.20
*
May 31, 1984
22,719.06
1,135.95  *
Taxable
Section
Section
Section
Year Ending
6651(a)
6655
6661
May 31, 1983
$ 24,956.00
$ 7,533.04
$ 9,982.40
May 31, 1984
5,679.77
1,355.63
2,271.91
The Commissioner determined that Security Counselors, Inc., was liable as transferee to the extent of the value of the assets received from Rocky Mountain -- $ 109,564. The issues for our decision *568 are: (1) Whether Security Counselors, Inc., is liable as transferee of the property of Rocky Mountain Investment Properties, Inc., pursuant to section 6901; and (2) whether the transferor, Rocky Mountain Investment Properties, Inc., is liable for the unpaid Federal income tax, additions to tax, and interest for its taxable years ending May 31, 1983, and May 31, 1984. FINDINGS OF FACT Some of the facts of this case have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. Security Counselors, Inc. (petitioner), was a Missouri Corporation at the time it filed the petition in this case. The president and sole shareholder of petitioner was Michael J. Ebeling (Michael). Petitioner was organized in 1948 by Michael for the sole purpose of holding legal title to property as a nominee. Morris K. Ebeling (Morris) is an attorney and Michael's stepson. On November 6, 1981, pursuant to the laws of the State of Missouri, Morris formed Rocky Mountain Investment Properties, Inc. (Rocky Mountain). The registration form of Rocky Mountain listed as president Morris K. Ebeling, his sister Connie J. Pynes as secretary, and *569 Michael J. Ebeling as a director. In November and December of 1981, Rocky Mountain opened checking account No. XXXX63-01 (the Clayton Metro Account) and account No. XXXX86-00 (the Elkhorn Time Share Fund) at Clayton Metro Bank, St. Louis, Missouri. The corporate address was the same as that of Morris Ebeling's law practice until 1984 when it was changed to Grand Bahama. In 1976, Morris acquired land at 1823 Kehrs Mill Road (the Kehrs Mill Road property) and subsequently constructed his residence on this property. On February 10, 1977, Morris and his wife Judith transferred legal title to the Kehrs Mill Road property to petitioner by general warranty deed. Morris retained beneficial ownership of the property. The Kehrs Mill Road property was to be the residence of Morris, his wife, and their children. Escrow, Ltd. (Escrow), was an entity incorporated in Grand Bahama. On December 14, 1981, a bank account was opened at the Royal Bank of Canada, Grand Bahama, account No. XXXX, titled Escrow, Ltd. (the Escrow Account). On December 8, 1981, Rocky Mountain purchased a condominium located near Sun Valley, Idaho (the Sun Valley condominium), from O.L.H. Development Company for $ *570 250,000. After a down payment of $ 10,000 and closing costs of $ 739.25, the amount due from Rocky Mountain at closing was $ 240,739.25. The closing agent for the purchase of the Sun Valley condominium was First American Title Company. Rocky Mountain paid $ 110,739.25 at closing with a cashier's check. The remaining $ 130,000 was paid on December 17, 1981, with a cashier's check drawn by Michael on the Escrow Account. The check was made payable to Michael and endorsed by Michael to the order of First American Title Company. Prior to this withdrawal on December 17, 1981, $ 135,000 was deposited into the Escrow Account. The transactions making up this deposit occurred on December 16, 1981, and were as follows: (1) a check in the amount of $ 50,000 was drawn on the Clayton Metro Account payable to Clayton Bank; (2) a check in the amount of $ 10,000 was drawn by Morris on a Clayton Metro Bank account titled "Zion Associates" payable to Clayton Bank; and (3) a wire transfer in the amount of $ 75,000 was made from account No. XXXX11-00 titled "Faith Associates" to the Escrow Account. Morris was the sole person who had signature authority over account No. XXXX11-00. During the *571 years 1981 through 1983, Rocky Mountain purportedly sold 1-week time share interests in the Sun Valley condominium to investors. Rocky Mountain continued to hold legal title to the Sun Valley condominium. The price for each time share week was $ 20,000. The payments were to be made in accordance with a schedule provided by Rocky Mountain: Year
Annual Payment
1 $ 5,000.00 Down  2 4,350.00 Interest    3 4,350.00 Interest    4 4,350.00 Interest    5 4,350.00 Interest    6 4,350.00 Interest    30
380,938.96 Interest and Principal  $ 407,688.96 Total Payments
Interest was computed using the "Rule of 78's" method and the "Add-on" method, which resulted in an accrued interest deduction for each time share week purchased of approximately $ 25,000 for the year of purchase. The investors in the time share interests were partnerships made up of a husband and wife, although a few were composed of individuals and corporations (collectively referred to as partnership(s)). Each partnership reported income on the accrual method. Using this method of computing interest and the accrual method of accounting, each partnership *572 would deduct over $ 20,000 of interest per year for the first 6 years and achieve approximately a five-to-one write-off. Rocky Mountain entered into real estate contracts with 34 investors for 52 time share weeks. None of the real estate contracts were recorded in the State of Idaho with the Blaine County registrar of deeds. The real estate contracts entered into between Rocky Mountain and the investors provided that each investor would receive a 1/50th undivided interest as a tenant in common in the Sun Valley condominium. Each real estate contract provided that Rocky Mountain would form a corporation known as "Interval Time Share Owners Association" (Association). The members of this Association were to be the owners of the time share interests. Legal title would not be transferred to the Association until all payments were made in accordance with the schedule as set forth above. As part of the Confidential Summary provided to the investors, each investor received an "Agreement to Foreclose" (Agreement). This Agreement provided that, in return for $ 10, Rocky Mountain would satisfy the outstanding liability of the defaulting investor solely by foreclosure against that investor's *573 time share or time shares. The Agreement was entered into by at least three of the 34 investors. Rocky Mountain's first taxable year ended May 31, 1982, and it filed a corporate income tax return for that year signed by its president, Morris Ebeling. On this return, Rocky Mountain reported $ 247,558.80 as interest expense and a loss of $ 4,441.60. During the taxable year ending May 31, 1982, Rocky Mountain did not have any outstanding debt which would give rise to interest expense of $ 247,558.80. As of May 31, 1982, Rocky Mountain reported total assets of $ 4,452.42. Rocky Mountain had earnings from the purported sale of time share interests during the taxable years ended May 31, 1983, and May 31, 1984, but it did not file tax returns for those years. In December of 1983, the Internal Revenue Service inquired about Rocky Mountain's failure to file a corporate return for the taxable year ended May 31, 1983, by sending form 4902, "Second Request for Information About Tax Form" to Rocky Mountain. The form was returned to the Internal Revenue Service dated January 22, 1984, and signed as president of Rocky Mountain, "M. Jerome." Michael is "M. Jerome." The form reflected that *574 the tax return had been filed and no tax was due and reflected a new corporate address of Rocky Mountain in Grand Bahama. Rocky Mountain made the following payments to Escrow: Clayton
Metro Account
Date
Date
Check No.
of Check
Cancelled
Amount
#104
12/18/81
01/18/82
$ 30,000
#572
06/30/83
Not Legible
43,500
#574
07/04/83
07/08/83
26,100
The checks were co-endorsed by "M. Jerome" or " Berniece Hodges," and Security Counselors, Inc. "Berniece Hodges" is Michael's wife Peggy H. Ebeling. These checks totaling $ 99,600 were received by petitioner. During the years 1982 and 1983, Morris ordered the following capital improvements for his residence, the Kehrs Mill Road property, which were paid for by Rocky Mountain: Date
Check No.
Amount
Payee
July 15, 1982
225
$ 2,000.00
Greco Tile
August 11, 1982
273
800.00    Greco Tile
August 18, 1982
281
2,400.00  U.S. Tennis Court Co.
January 10, 1983
418
935.90    Beyers & Co.
January 10, 1983
423
1,975.90  HYDRO-DYNAMICS
September 18, 1983
650
297.95    HYDRO-DYNAMICS
April 8, 1983
477
193.26    Lake Supply
July 28, 1983
608
218.06    Lake Supply
June 1, 1983
534
466.37    Lake Supply
December 17, 1982
395
225.17    Lake Supply
October 28, 1982
360
225.36    Lake Supply
Total          $ 9,737.97
*575 On August 29, 1983, a deed of trust was executed with respect to the Kehrs Mill Road property. The deed of trust provided that such property was conveyed to Steven J. Pynes as trustee to secure a debt and promissory note of $ 710,000 purportedly owed by petitioner to Escrow. At the time the deed of trust was executed, petitioner did not owe Escrow $ 710,000 or any other amount. On September 5, 1983, Michael and Peggy executed a warranty deed transferring title of the Sun Valley condominium from Rocky Mountain to International Guarantee Company, Ltd. (International). International was a Bahamian corporation of which Michael was president. The warranty deed was executed before a notary public in Grand Bahama and reflected that on September 5, 1983, "Personally appeared M. Jerome and B. Hodges, known to me to be President and Secretary of the corporation that executed this instrument." On March 31, 1986, International transferred title of the Sun Valley condominium to Pacific Rim Holdings, Ltd. International is a corporation which was organized in Grand Bahama. On September 29, 1982, Michael and Peggy executed a document titled "Resolution of Directors re Banking Account and *576 Securities" which authorized the officers of International to maintain bank accounts at Royal Bank of Canada, Freeport, Grand Bahama. The document was signed as president and secretary of International using "M. Jerome" and "Berniece Hodges," respectively. Michael had previously pled guilty to the felony charge of making and subscribing a false corporate return for petitioner for the 1985 taxable year. On September 30, 1983, Rocky Mountain closed the Clayton Metro Account with a Miscellaneous Credit Memo of $ 3.93. On January 28, 1986, the Commissioner mailed a Notice of Jeopardy Assessment and Right of Appeal to Rocky Mountain. On March 20, 1986, the Commissioner mailed a statutory notice of deficiency to Rocky Mountain. The Commissioner determined that Rocky Mountain owed tax for its taxable years ended May 31, 1983, and May 31, 1984, in the amount of $ 99,824.01 and $ 22,719.06, respectively, plus additions to tax, and interest. The Commissioner determined Rocky Mountain's income and deduction for those periods to be: May 31, 1983
May 31, 1984
Down Payments
$ 75,000.00  $ 5,000.00  Interest Income
178,718.32 70,839.16 Maintenance Fee Income
7,500.00 2,750.00 Income from the Sale of
Tax Shelters  261,218.32 78,589.16 Other Income-Norman W. Olsen
13,900.00 Real Estate Tax Expense
(825.14)
(66.50)
Taxable Income
260,393.18 92,422.66 Deficiency     $ 99,824.01  $ 22,719.06 *577 On December 22, 1986, the Commissioner mailed a Transferee Notice of Jeopardy Assessment and Right of Appeal to Security Counselors, Inc. The Commissioner determined that petitioner was liable as transferee of the property of Rocky Mountain in the amount of $ 109,564 with respect to taxes, additions to tax, and interest owed by Rocky Mountain for its taxable years ended May 31, 1983, and May 31, 1984. On February 19, 1987, the Commissioner mailed a notice of liability to Security Counselors, Inc. The notice provided that Security Counselors, Inc., was liable as a transferee of Rocky Mountain as it had received the following amounts from Rocky Mountain: Check
Date
No.
of Check
Amount
#104
[2] 12/31/81 $ 30,000 #572
06/30/83
43,500
#574
07/04/83
26,100
Capital Improvements to
1823 Kehrs Mill Road, MO 7/82 - 9/83 9,964 Liability  [3] $ 109,564
The Commissioner determined that Security Counselors, Inc., was liable as *578 transferee to the extent of the value of the assets received from Rocky Mountain. OPINION I. Transferee Liability
The first issue in this case is whether petitioner is a transferee at law or in equity of Rocky Mountain so as to make it liable for any part or all of the tax, additions to tax, and interest owed by Rocky Mountain. Section 6901(a) provides a method of collection of taxes from a transferee of property of a taxpayer who is liable at law or in equity for the indebtedness of the transferor. Whether a transferee of property is liable for the transferor's indebtedness is decided under the laws of the state in which the transfers of property occurred. Commissioner v. Stern, 357 U.S. 39, 45 (1958). Section 6902(a) provides that, in proceedings before this Court, respondent has the burden of proving that a taxpayer is liable as a transferee of property of a taxpayer. Sec. 6902(a); Rule 142(d). Petitioner has the burden of proving that the transferor is not liable *579 for the tax. Sec. 6902(a); Rule 142(d). In the instant case, the parties do not agree that the transfers took place in Missouri. Respondent's theory of transferee liability is founded upon two sets of transactions. The first is the transfer of three checks to petitioner and the second is the capital improvements that were made to the Kehrs Mill Road property. Petitioner argues that, as the three checks were payable to Escrow and were then endorsed "Pay to the order of Royal Bank of Canada," which was located in Grand Bahama, it is just as likely that the transfers took place in Grand Bahama as it is that they took place in Missouri. Thus, petitioner contends that Morris could have written the checks on the Rocky Mountain account while in Grand Bahama. We find that the transfers took place in Missouri. The State of incorporation of the transferor, Rocky Mountain, was Missouri and the three checks upon which transferee liability is based were drawn on Rocky Mountain's account which was located in Missouri. Mo. Ann. Stat. sec. 428.020 (Vernon 1952) provides: Every conveyance or assignment *580 in writing, or otherwise, of any estate or interest in lands, or in goods and chattels, or in things in action, or of any rents and profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, and every bond, suit, judgment, decree or execution, made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands, or to defraud or deceive those who shall purchase the same lands, tenements or hereditaments, or any rent, profit or commodity issuing out of them, shall be from henceforth deemed and taken, as against said creditors and purchasers, prior and subsequent, to be clearly and utterly void. The law of Missouri, specifically section 428.020 as it applies in transferee liability cases, was set forth in Bartmer Automatic Self Service Laundry, Inc. v. Commissioner, 35 T.C. 317, 322 (1960). In Bartmer, we held that A prima facie case of transferee liability is established if the respondent succeeds in proving, by competent evidence (1) that *581 assets were transferred to the alleged transferee without consideration or for inadequate consideration; (2) that the transferor was insolvent or the transfer left the transferor insolvent or the transfer was a "purely voluntary conveyance conceived and made with the intent of hindering, delaying, and defrauding" the Government; (3) that the assets transferred had value, and what that value was on the date of transfer; and (4) he has made every reasonable effort to collect the sums due. In interpreting whether a taxpayer voluntarily conveyed property with the intent of hindering, delaying, and defrauding creditors, the courts of Missouri have recognized that it is difficult to establish "intent" under section 428.020 by direct proof. As a result, "intent" must be established by the facts and circumstances surrounding the parties. By this analysis, Missouri courts have recognized a number of indicia or "badges of fraud" which, in certain combinations, establish a strong inference of fraud. These "badges" of fraud are: 1) Conveyance to a near relative; 2) Conveyance in anticipation of *582 suit; 3) A transfer of all or nearly all of a debtor's property; 4) Insolvency; 5) Inadequate consideration; 6) Unusual clauses in instruments or unusual methods of transacting business; 7) Retention of possession by the debtor; and 8) The failure to produce abutting evidence when the circumstances surrounding the transfer are suspicious. See Allison v. Mildred, 307 S.W.2d 447 (Mo. 1957); Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870 (1939); Thomas v. Shoots, 651 S.W.2d 663, 665 (Mo. App. 1983); Morris v. Holland, 529 S.W.2d 948 (Mo. App. 1975). In this analysis, certain "badges" carry more weight than others. While none of the "badges" alone establishes fraud, a concurrence of several of the "badges" raises a presumption of fraud. Cohoon v. Cohoon, 627 S.W.2d 304, 307 (Mo. App. 1981). Pursuant to Commissioner v. Stern, supra, in order to impose transferee liability *583 at law or in equity, the Federal statute, section 6901, must be satisfied as well as any test under State law. Therefore, before we decide the existence of petitioner's liability under Missouri law, we must address petitioner's arguments with respect to what transfers liability attaches to under section 6901. Petitioner has raised two arguments with respect to its liability as a transferee under section 6901. A. Time of Liability
Petitioner contends that it cannot be a transferee with respect to the $ 30,000 check dated December 18, 1981, because such a transfer was prior to the accrual of the tax liability for Rocky Mountain's taxable years ending May 31, 1983, and May 31, 1984, the taxable years in issue. Section 6901 provides a method of collecting from a transferee amounts owed for the tax deficiencies of the transferor. For transferee liability to exist under section 6901, however, there must be a transfer of assets which was made during or after the period for which the liability for the debt accrued. Commissioner v. Southern Bell Telephone & Telegraph Co., 102 F.2d 397, 401 (6th Cir. 1939), *584 affg. 34 B.T.A. 540 (1936); Kean, Transferee v. Commissioner, 91 T.C. 575, 603 (1988). The tax liability of the transferor, Rocky Mountain, is for the taxable years ending May 31, 1983, and May 31, 1984. Thus, the earliest date at which transferee liability could accrue against petitioner is June 1, 1982, the beginning date of Rocky Mountain's taxable year ending on May 31, 1983. The transfers in question were made from December 18, 1981, through September 1983. With respect to the transfers made on or after June 1, 1982, transferee liability exists under section 6901 because the transfer of assets was made during the period for which the liability for the debt accrued. Leach v. Commissioner, 21 T.C. 70 (1953); Wyche v. Commissioner, 36 B.T.A. 414 (1937). Check number 104 was cancelled by the bank on January 18, 1982. Therefore, it was transferred before the beginning of the period. This transfer cannot result in transferee liability against petitioner. The other checks were written and transferred to petitioner after June 1, 1982. Respondent, however, contends fraud is provable by evidence that the actual *585 transfers of property in dispute were part of a series of transfers or a comprehensive plan by the transferor to defraud his creditors. He cites Harrison v. Harrison, 339 S.W.2d 509 (Mo. App. 1960), in support of this argument. We do not dispute respondent's argument that a single transfer as well as a series of transfers could be found to be fraudulent pursuant to section 428.020. Pursuant to section 6901 however, there must be a transfer of property during or after the period for which the liability for the debt accrued. In Harrison and the cases cited therein, section 6901 was not at issue and a judgment or liability existed prior to the series of transfers. We do not have that situation in the instant case. [4]
B. Transfers of Property
The next issue for our decision is whether Rocky Mountain transferred property to petitioner within the meaning of section 6901(a)(1)(A) *586 with respect to the capital improvements which Rocky Mountain paid for with respect to the Kehrs Mill Road property. Petitioner contends that respondent has failed to prove that there was a transfer to petitioner because petitioner, although it held legal title to the property, was not the beneficial owner. Respondent contends that many fraudulent conveyances constitute conveyances in which the transferee does not acquire beneficial ownership of the assets transferred, citing United States v. Jones, 631 F.Supp. 57 (W.D. Mo. 1986), in support of his argument. We do not disagree with respondent's position. However, this principle is not applicable to cases involving transferee liability and indeed, respondent has not cited any cases involving transferee liability in support of his position. Although the law of the state where the transfers occurred governs the substantive aspects of transferee liability, the principles of section 6901 may be applied to eliminate, enlarge, or diminish transferee liability. Commissioner v. Stern, supra.Pursuant to *587 section 6901, a transferee of property who receives no beneficial ownership interest in the transferred property cannot be held liable for the unpaid tax of the transferor. Tomfohr v. Commissioner, 44 B.T.A. 730 (1941). Morris and Judith transferred legal title to the Kehrs Mill Road property to petitioner in 1977 without any intention of passing beneficial ownership. This transfer of property is not at issue in the instant case. Morris retained beneficial ownership of the property and subsequently constructed a house on this property. During the years in issue, improvements were made to this property by Morris and paid for by Rocky Mountain. There is no evidence that petitioner had any interest in the property or the improvements other than as legal titleholder. Although naked legal title was in petitioner, Morris had the right and did direct how the property was to be used. Commissioner v. Southern Bell Telephone & Telegraph Co., supra.As a result, there can be no transferee liability with respect to the improvements made to the Kehrs Mill Road property. C. State Law
The final issue for our decision is whether Rocky Mountain, *588 in transferring the two checks to petitioner, was fraudulent under the Missouri Fraudulent Conveyances statute section 428.020. Mo. Ann. Stat. sec. 428.020 (Vernon 1952). Having held above that the transfer of check number 104 for $ 30,000 is not subject to transferee liability and the improvements to the Kehrs Mill Road property are not subject to transferee liability, we are left with deciding the fate of the two transfers of checks totaling $ 69,600. Turning to the application of section 428.020 to the instant case, we find that the transfers in question exhibit many of the "badges of fraud" raising a presumption of fraud. With respect to the consideration for the transfers made by Rocky Mountain to petitioner, petitioner contends that the transfers of the three checks to petitioner were repayments of loans which Michael made to Morris to enable Morris to construct a home on the Kehrs Mill Road property. However, petitioner has not brought forth any evidence substantiating the existence of these alleged loans. Petitioner argues, on brief, many facts regarding these loans which we are unable to glean from the record. In his arguments, petitioner relies upon the testimony *589 of Michael J. Ebeling to establish the existence of the loans. During trial, the only evidence presented on behalf of petitioner was Michael's uncorroborated testimony. However, based upon inconsistencies in his testimony, we do not find Michael to be a credible witness. Michael did not explain his use or his wife's use of aliases in signing documents. He testified that he had no concept of Rocky Mountain or its operations prior to this trial, yet the exhibits show that he signed documents on behalf of Rocky Mountain as its president. Furthermore, Michael, using the alias "M. Jerome," falsely represented to the Internal Revenue Service that a tax return for Rocky Mountain for the taxable year ending May 31, 1983, had been filed. These inconsistencies combined with the fact that Michael had previously pled guilty to the felony charge of making and subscribing a false corporate return for petitioner for the 1985 taxable year cast a grave shadow of doubt over his credibility. Petitioner also relies upon a contract for deed between petitioner and Morris and Judith as evidence of the existence of the loans. However, the contract for deed reflects the fact that legal title to the *590 Kehrs Mill Road property was to be conveyed from Morris and Judith to petitioner. It does not prove the existence of any loans made by Michael to Morris. The contract for deed merely recites that Michael and Peggy "contemplate advancing the money as per need above [reference to construction of a home on the Kehrs Mill Road property]" to Morris and Judith. We are left with a complete absence of proof as to the existence of any loans other than the fact that Michael and Peggy are contemplating advancing monies. Furthermore, the contract for deed speaks in terms of "advancing" money subsequent to February 4, 1977, the date of the contract for deed. Michael testified, however, that amounts had been transferred to Morris in 1976. Based upon these facts, we cannot say that the contract for deed is evidence of the existence of the loans. Petitioner attaches significance to the fact that respondent, in his audit work papers, treated the three checks as constructive dividends to Morris. In addition, petitioner makes light of the fact that a 1979 Internal Revenue Service report concluded that Michael had lent Morris $ 103,000. However, these facts are irrelevant as they do not establish *591 the existence of any loans in the instant case. There was no consideration for the transfers made by Rocky Mountain to petitioner. Rocky Mountain was formed in 1981 and Morris was the incorporator and president. Rocky Mountain's first taxable year ended May 31, 1982, and it filed a corporate income tax return for that year signed by Morris reflecting a loss of $ 4,441. This loss is the result of an interest expense deduction claimed in the amount of $ 247,558. An examination of the balance sheet attached to the 1982 return does not reflect any liability which would justify an interest expense deduction of that amount. Morris, who was an attorney at that time, should have been aware of the imminent administrative and judicial efforts by the Internal Revenue Service to collect any taxes due from Rocky Mountain as a result of filing such a return. Subsequent to filing its 1982 return, two payments were made by Rocky Mountain to petitioner in the amount of $ 69,600. Michael was president and sole shareholder of petitioner, Security Counselors, Inc. During 1981, Rocky Mountain purchased the Sun Valley condominium for $ 250,000. Through a series of transactions in which Morris *592 transferred $ 135,000 to the Escrow Account in Grand Bahama, Michael thereafter drew and endorsed a cashier's check in the amount of $ 130,000 from this account as part payment for the Sun Valley condominium. No tax returns were filed by Rocky Mountain for the taxable years ending May 31, 1983, and May 31, 1984. In December of 1983, a form was sent by the Internal Revenue Service requesting information with regard to Rocky Mountain's failure to file a tax return for the taxable year ending May 31, 1983. In response to this form, "M. Jerome," as president of Rocky Mountain, responded that the tax return had been filed and that Rocky Mountain had no tax liability for that year. The response also advised the Internal Revenue Service of the change in address of Rocky Mountain from Missouri to Grand Bahama. Rocky Mountain transferred, by two separate checks written by Morris on Rocky Mountain's Clayton Metro Account, $ 69,600 to the Escrow Account. Michael or Peggy endorsed each check with their alias "M. Jerome" or "Berniece Hodges." These checks totaling $ 69,600 were then transferred to petitioner. On August 29, 1983, a deed of trust was executed between petitioner and Escrow *593 with respect to the Kehrs Mill Road property, which encumbered this property to the extent of $ 710,000. Michael testified that there was in fact no debt underlying this deed of trust. Petitioner has not provided any believable explanation as to why this deed of trust was executed. On September 5, 1983, "M. Jerome" as president and "B. Hodges" as secretary of Rocky Mountain executed and filed a warranty deed which transferred ownership of the Sun Valley condominium from Rocky Mountain to International, a Bahamian corporation of which Michael was president. The warranty deed was executed before a notary public in Grand Bahama and reflected that on September 5, 1983, "Personally appeared M. Jerome and B. Hodges, known to me to be President and Secretary of the corporation that executed this instrument." "M. Jerome" is Michael and "B. Hodges" is his wife Peggy. The Clayton Metro Account was closed out on October 3, 1983, with a miscellaneous credit memo in the amount of $ 3.93. Based upon the above facts, we have found that the conveyance of the two checks totaling $ 69,600 was made between relatives for no consideration in anticipation of administrative and judicial action by *594 the United States. In addition, the unexplained use of aliases, the illusory deed of trust, the transfer of $ 69,600 by Rocky Mountain through Escrow to petitioner, and the unusual connections between Michael, Morris, petitioner, Rocky Mountain, Escrow, and International are not only unusual methods of conducting business, but are unexplained by petitioner. We, therefore, find that the transfers of the two checks in the amount of $ 69,600 were purely voluntary conveyances conceived and made with the intent of hindering, delaying, and defrauding the Government in its efforts to collect the deficiencies of Rocky Mountain, and were, therefore, void under Missouri law. As a result, respondent need not prove the insolvency of Rocky Mountain at the time of the transfers. Bartmer Automatic Self Service Laundry, Inc. v. Commissioner, supra at 324. The parties do not dispute what the value of the assets was on the date of the transfer. Therefore, the final issue in deciding whether petitioner is liable as a transferee is whether respondent has made every reasonable effort to collect the sums due from Rocky Mountain before proceeding against petitioner as transferee.
*595 Petitioner contends that the Sun Valley condominium was conveyed to International by a deed dated September 5, 1983, and was not recorded until October 7, 1983. Thus, the Sun Valley condominium could have been levied upon by respondent to satisfy Rocky Mountain's liabilities until that date. Rocky Mountain's corporate income tax return for the taxable year ending May 31, 1983, was due on August 15, 1983. This return and the return for the taxable year ending May 31, 1984, were never filed. When the Internal Revenue Service inquired as to the existence of the 1983 return, Michael, acting as president of Rocky Mountain, replied that no tax was due and such return had been filed. Furthermore, on Rocky Mountain's corporate return for the taxable year ending May 31, 1982, Rocky Mountain failed to list the Sun Valley condominium as an asset. On January 28, 1986, the Commissioner mailed a Notice of Jeopardy Assessment and Right of Appeal to Rocky Mountain. A statutory notice of deficiency was mailed to Rocky Mountain on March 20, 1986. In light of these facts, we find that respondent made every reasonable effort to collect the sums due from Rocky Mountain before proceeding against *596 petitioner as transferee. II. Tax Liability of Rocky Mountain
We must next decide whether Rocky Mountain is liable for the unpaid Federal income taxes, additions to tax, and interest for its taxable years ending May 31, 1983, and May 31, 1984. The burden of proof is on petitioner to prove that the transferor, Rocky Mountain, is not liable for the tax. Sec. 6902(a); Rule 142(d). Rocky Mountain failed to file corporate tax returns for the taxable years ending May 31, 1983, and May 31, 1984. In the statutory notice of deficiency mailed to Rocky Mountain, the Commissioner determined that Rocky Mountain had "Income from Sale of Tax Shelters" for the taxable years ending May 31, 1983, and May 31, 1984, in the amounts of $ 261,218.32 and $ 78,589.16. These amounts were determined based upon an analysis of Rocky Mountain's deposits into the Clayton Metro Account and the Elkhorn Time Share Fund. These deposits were classified as follows: May 31, 1983 May 31, 1984
Down Payments
$ 75,000.00 $ 5,000.00 Interest
178,718.32
70,839.16
Maintenance Fees
7,500.00
2,750.00
Total     $ 261,218.32
$ 78,589.16
In addition, the Commissioner determined *597 "Other Income - Norman W. Olsen" in the amount of $ 13,900 for the taxable year ending May 31, 1984. The Commissioner allowed deductions of $ 825.14 and $ 66.50 for the taxable years ending May 31, 1983, and May 31, 1984, for substantiated real estate taxes paid on the Sun Valley condominium. As a result, the Commissioner determined deficiencies in Rocky Mountain's Federal income tax for the taxable years ending May 31, 1983, and May 31, 1984, in the amounts of $ 99,824.01 and $ 22,719.06. Petitioner raises four arguments with respect to respondent's adjustments. Petitioner first contends that the transactions entered into between Rocky Mountain and the investors are sales of the time share interests and, as a result, Rocky Mountain should be allowed to report, as principal, the down payments and interest under the installment method pursuant to section 453. Alternatively, petitioner contends that if the transactions were not sales, they should be treated as leases and Rocky Mountain should be allowed depreciation on the Sun Valley condominium. A sale is a transfer of property for *598 money or a promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-571 (1965). A sale occurs for Federal income tax purposes upon the transfer of the benefits and burdens of ownership. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). Whether the benefits and burdens of ownership have passed is a question of fact which must be determined from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. Grodt & McKay Realty, Inc. v. Commissioner, supra.We have analyzed such transactions on the basis of the following factors: (1) Whether legal title passes, (2) how the parties treat the transaction, (3) whether an equity was acquired in the property, (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments, (5) whether the right of possession is vested in the purchaser, (6) which party pays the property taxes, (7) which party bears the risk of loss or damage to the property, and (8) which party receives the profits from the operation and *599 sale of the property. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238. During the years 1981 through 1983, Rocky Mountain sold 52, 1/50 interests in the Sun Valley condominium. The real estate contracts entered into between Rocky Mountain and the investors did not create a present obligation on Rocky Mountain to execute and deliver a deed to the investor of the time share interest or the Association. Under each real estate contract, the Association acquired legal title to the time share units upon payment in full of the real estate contract. Absent prepayment, this would occur 30 years from the date of the alleged sale. There was no transfer of equitable title as the real estate contracts were never recorded in the State of Idaho with the Blaine County registrar of deeds. However, we do not believe that title would ever pass. At least three of the investors entered into an Agreement to Foreclose. This Agreement provided that, in return for $ 10, Rocky Mountain would satisfy the outstanding liability of the defaulting investor solely by foreclosure against that investor's time share or time shares. Thus, this Agreement allowed an investor *600 to walk away from the real estate contract at any time with no liability. Petitioner contends that the obligations of the other investors were apparently full recourse obligations as respondent has failed to bring forth evidence of their existence. However, the burden is on petitioner to establish that the transferor, Rocky Mountain, is not liable for the tax, additions to tax, and interest for the respective years. Petitioner has failed to bring forth any evidence on this issue. Each of the 34 investors agreed to pay $ 407,688.96 for a 1-week time share interest in a condominium that was purchased for $ 250,000. Of this total purchase price for a 1-week time share interest, $ 380,938.96 constituted a balloon payment that was to be made in the thirtieth year. The Agreement allowed each investor to walk away from the transaction having taken full advantage of the five-to-one write-off. Without more evidence, it is impossible for us to believe that any investor would not sign an Agreement upon the purchase of a time share interest. Furthermore, on September 5, 1983, Rocky Mountain transferred title of the Sun Valley condominium to International. On March 31, 1986, International *601 transferred title of the condominium to Pacific Rim Holdings, Ltd. The real estate contracts for the time share interests were not amended in any way reflecting this change in ownership. These contracts specifically provide that Rocky Mountain will transfer legal title to the Sun Valley condominium to the Association at the end of the 30-year financing period. Rocky Mountain no longer holds legal title to such property. Rocky Mountain paid real estate taxes of $ 825.14 and $ 66.50 with respect to the Sun Valley condominium for the taxable years ending May 31, 1983, and May 31, 1984. Consistent with this analysis, we conclude that the transactions entered into between Rocky Mountain and the investors were not sales of time share interests. Therefore, there was no "disposition of property" pursuant to section 453(a) and, accordingly, the funds received by Rocky Mountain for the purchase of time share interests are properly characterized as gross income under section 61 in the taxable year received. Petitioner's alternative argument that Rocky Mountain should be allowed depreciation on the Sun Valley condominium is also without merit. We have found as a fact that Rocky Mountain *602 purchased the condominium in December 1981. It claimed no deduction for depreciation for its taxable year ending May 31, 1982. It transferred title to International on September 5, 1983. There is no evidence as to when the Sun Valley condominium was first placed in use in connection with the sale of time share interests. Petitioner has not requested a finding as to the amount of depreciation to which Rocky Mountain would be entitled. The record is insufficient to allow a deduction for depreciation. Petitioner's second argument is that respondent erred in not allowing any deduction for various ordinary and necessary business expenses incurred by Rocky Mountain in connection with maintaining and operating the Sun Valley condominium pursuant to section 162. Petitioner relies upon a revenue agent's report regarding Rocky Mountain to prove that expenses were incurred. The revenue agent's report is not evidence that any expenses were incurred. Petitioner has failed in its burden of proof. Thirdly, petitioner contends that the payments made by Rocky Mountain to Morris should be treated as compensation and, therefore, deductible by Rocky Mountain. *603 Payments are deductible as compensation if, at the time the payments were made, the payments were intended to be compensation. Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). Whether such intent existed at the time the payments were made is a factual question to be decided on the basis of the evidence presented. Paula Construction Co. v. Commissioner, 58 T.C. at 1059; Electric & Neon, Inc. v. Commissioner, 56 T.C. at 1340. Petitioner has not brought forth any evidence whatsoever supporting the conclusion that the amounts which were expended for Morris' benefit were intended by Rocky Mountain to be treated as compensation. Petitioner's final argument is that Rocky Mountain should be allowed depreciation for furniture purchased for use in the Sun Valley condominium. Petitioner has not, however, demonstrated the furniture was *604 "used" in the Sun Valley condominium subsequent to its purchase. Sec. 168(c)(1). Although petitioner has brought forth evidence regarding the purchase of the furniture, petitioner has failed to prove by testimony or by documentary evidence that the furniture was actually used in its trade or business in the Sun Valley condominium. As a result, petitioner's argument is without merit. Petitioner does not contest the additions to tax as determined against Rocky Mountain. They are, therefore, sustained. We have held above that only the two checks transferred to petitioner ($ 69,600) are subject to transferee liability. We have also held that the Commissioner correctly determined the Federal income tax and additions to tax of Rocky Mountain, the transferor, which exceeds the $ 69,600 total of the two checks. A decision will, therefore, be entered in favor of respondent in the amount of $ 69,600. Decision will be entered for the respondent in the reduced amount. Footnotes
1. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the years involved herein, and all rule numbers refer to the Rules of Practice and Procedure of this Court. ↩
*. 50 percent of the interest due on the entire deficiencies in income taxes.↩
2. The date on the check is December 18, 1981. ↩
3. The total of the capital improvements made to the Kehrs Mill Road property was $ 9,737.97. As a result of this reduction, the liability is $ 109,338.↩
4. See Estate of Gryder v. Commissioner, T.C. Memo. 1981-466, involving transferee liability applying sec. 428.020↩ in which a series of payments were made during and after the accrual of the period of liability which were presumptively fraudulent and void.